U.S. District Court
No. 87-335

ELIZABETH SIMONEAU & a.

v.

SOUTH BEND LATHE, INC. & a.

May 13, 1988

*Wiggin & Nourie*, of Manchester (*Gregory A. Holmes & a.* on the brief, and *Mr. Holmes* orally), for the plaintiffs.

*Sheehan, Phinney, Bass & Green P.A.*, of Manchester (*Daniel P. Schwarz* on the brief and orally), for the defendants.

BROCK, C.J. From a complaint alleging strict liability in tort pending before the United States District Court for the District of New Hampshire (*Loughlin*, J.), the following question is certified to us pursuant to Supreme Court Rule 34:

"Does New Hampshire law encompass the so-called 'product-line' theory of successor liability as propounded in *Ray v. Alad,* 560 P.2d 3 (Cal. 1977) and as adopted by California, New Jersey, (*Ramirez v. Amsted,* 431 A.2d 811 (N.J. 1981)), Washington (*Martin v. Abbott Labs,* 689 P.2d 368 (Wash. 1984)), and Pennsylvania (*Dawejko v. Jorgensen Steel,* 434 A.2d 106 (Pa. Super. 1981))."

For the reasons that follow, we answer the certified question in the negative.

The facts are set forth clearly in the order of certification from the federal court, and we reiterate them here. In January, 1985, the plaintiff, Elizabeth Simoneau, was injured while operating a punch press at her place of employment. The press had been manufactured in 1948 by Johnson Machine and Press Corporation (Johnson).

Prior to 1956, Johnson manufactured presses in Elkhart, Indiana. In 1956, Bontrager Construction Company (Bontrager) purchased Johnson's assets for cash and received the only share of Johnson stock. Bontrager continued to manufacture presses under the Johnson name.

On August 29, 1962, Amsted Industries, Inc. (Amsted) purchased all the assets of Bontrager, including the sole share of Johnson stock. Amsted assumed the obligations and liabilities of Bontrager necessary for continuation of the business. However, Amsted specifically refused to assume any liability for injuries incurred from the use of presses previously manufactured and sold by Bontrager. Under the terms of the purchase agreement, Bontrager agreed to dissolve its corporate entity.

The sole share of Johnson stock was transferred on the Johnson stock records from Bontrager to Amsted. A new certificate was issued in Amsted's name, and Amsted immediately assigned all its rights and obligations under the purchase agreement with Bontrager to South Bend Lathe, Inc. (SBL–I), a wholly-owned Amsted subsidiary.

SBL–I took possession of Bontrager's assets on September 1, 1962. It continued to manufacture Johnson presses using substantially the same facility, employees, assets, and middle-level management personnel that Bontrager had used. However, none of the shareholders, directors, or officers of Bontrager became shareholders, directors, or officers of Amsted or SBL–I. Amsted notified Bontrager's and Amsted's customers that Amsted would continue to manufacture and sell Johnson presses.

Bontrager voluntarily dissolved in 1964. In 1965, Amsted dissolved both SBL–I and Johnson, which only existed as a paper company. The assets of both dissolved companies were distributed to Amsted.

South Bend Lathe, which now operated as an unincorporated division of Amsted, continued to manufacture Johnson presses in the original Elkhart, Indiana plant. In 1966, Amsted transferred the manufacturing operations from Elkhart to South Bend, Indiana. In 1975, Amsted sold the assets comprising the Johnson press line of its operation to L.W.E., Inc., a paper corporation representing the employees of the South Bend Lathe division of Amsted.

Following culmination of the sale, L.W.E., Inc. changed its name to South Bend Lathe, Inc. (SBL–II) and continued to manufacture Johnson presses.

Simoneau and her husband brought suit against Amsted and SBL–II alleging, *inter alia,* that SBL–II is liable under the "product line" theory for having manufactured and maintained an allegedly defective product. The "product line" theory, as expressed in *Ray v. Alad,* stated that the purposes underlying strict liability in tort require:

> "that a party which acquires a manufacturing business and continues the output of its line of products under the circumstances here presented assumes strict tort liability for defects in units of the same product line previously manufactured and distributed by the entity from which the business was acquired."

*Ray v. Alad,* 136 Cal. Rptr. 574, 582, 560 P.2d 3, 11 (1977).

Three factors provide the primary justification for imposing strict liability under the product line theory:

> "(1) the nonavailability to [a] plaintiff of any adequate remedy against [the predecessor corporation] as a result of [the predecessor's] liquidation prior to [the] plaintiff's injury; (2) the availability to [the successor] of the knowledge necessary for gauging the risks of injury . . . together with the opportunity for meeting the cost arising from those risks by spreading it among current purchasers of the product line; and (3) the fact that the good will transferred to and enjoyed by [the successor] could not have been enjoyed by [the predecessor] without the burden of liability for defects in [products] sold under its aegis."

1 L. Frumer & M. Friedman, Products Liability § 2.06[4] (1987) (citing *Ray v. Alad, supra* at 580, 560 P.2d at 9); *see also Ramirez v. Amsted Industries, Inc.,* 86 N.J. 332, 349, 431 A.2d 811, 819–20 (1981); *Dawejko v. Jorgensen Steel Co.,* 434 A.2d 106, 109–10 (Pa. Super. 1981); *Martin v. Abbott Labs,* 102 Wash. 2d 581, 614, 689 P.2d 368, 387–88 (1984).

The defendants argue that the factors that justify imposing liability under the product line theory are inconsistent with the policy reasons underlying this State's recognition of strict liability in tort. *Compare Ray v. Alad, supra* at 581, 560 P.2d at 10, *with Thibault v. Sears Roebuck & Co.,* 118 N.H. 802, 806, 395 A.2d 843, 845–46 (1978). Specifically, they argue that, since we have rejected "risk spreading" as a justification for the imposition of strict liability, logic requires that we reject the product line theory. *Thibault supra.* We agree.

█ A year after the California Supreme Court first adopted the product line theory and its rationale in *Ray v. Alad,* this court explicitly stated that the "'spreading' of [the] risk" theory provides no justification for imposing strict liability on a corporate defendant. *Thibault supra.* In disagreeing with the risk-spreading approach, we observed that "strict liability is not a no-fault system of compensation. The common-law principle that *fault and responsibility* are elements of our legal system applicable to corporations and individuals alike will not be undermined or abolished by 'spreading' of risk and cost in this State." *Thibault supra.* (Emphasis added.)

█ Indeed, as pointed out by the defendants' counsel at oral argument, proof of a manufacturer's responsibility remains an essential element of a plaintiff's strict liability claim under New Hampshire law. *Thibault, supra* at 806, 395 A.2d at 846; *Buttrick v. Lessard,* 110 N.H. 36, 39, 260 A.2d 111, 113 (1969) (quoting Restatement (Second) of Torts § 402A comment f (1966) for the proposition that manufacturer's responsibility to public is basis for strict liability). The doctrine of strict liability to which we adhere emphasizes that it is "the manufacturer who placed the item into the stream of commerce [who is] held to be 'responsible for the finished product.'" *Heath v. Sears, Roebuck & Co.,* 123 N.H. 512, 521, 464 A.2d 288, 292 (1983) (quoting *MacPherson v. Buick Motor Co.,* 217 N.Y. 382, 394, 111 N.E. 1050, 1055 (1916)).

█ We limit the application of strict tort liability in this jurisdiction by continuing to emphasize that liability without negligence is not liability without fault. *See Bagley v. Controlled*

*Environment Corp.*, 127 N.H. 556, 558–59, 503 A.2d 823, 825 (1986); *Moulton v. Groveton Papers Co.*, 112 N.H. 50, 52, 289 A.2d 68, 71 (1972). We do not impose what amounts to absolute liability on a manufacturer. *Heath supra; Wood v. Public Serv. Co.*, 114 N.H. 182, 188, 317 A.2d 576, 579 (1974); *Elliott v. LaChance*, 109 N.H. 481, 484, 256 A.2d 153, 156 (1969). This court continues to be extremely reluctant to extend the doctrine of strict liability unnecessarily, *Siciliano v. Capitol City Shows, Inc.*, 124 N.H. 719, 730, 475 A.2d 19, 25 (1984); *Wood v. Public Serv. Co., supra* at 188–89, 317 A.2d at 579, and we have specifically declined to do so when there has been no commercial relationship between the defendant and the plaintiff. *Bagley v. Controlled Environment Corp., supra* at 559, 503 A.2d at 825; *Wood v. Public Serv. Co. supra.* Accordingly, we join a majority of jurisdictions in holding that the product line theory of recovery, as propounded in *Ray v. Alad* and its progeny, is incompatible with this State's approach to the doctrine of strict liability in tort, and we decline to adopt it. *See* AMERICAN LAW OF PRODUCTS LIABILITY 3d § 7.15 n.3 (1987) (and cases cited). Accordingly, the answer to the certified question is no.

█ We do note that a number of courts cite *Cyr v. B. Offen & Co.*, 501 F.2d 1145 (1st Cir. 1974), for the proposition that New Hampshire has adopted "risk spreading" under the doctrine of strict liability. *See Ramirez*, 86 N.J. at 344, 434 A.2d at 817; *Dawejko*, 434 A.2d at 108. The *Cyr* decision, however, predates our express rejection of a risk-spreading approach in *Thibault*, and to the extent *Cyr* does suggest that we embrace risk spreading, it is no longer a valid interpretation of New Hampshire law. *Cyr, supra* at 1154.

*Remanded.*

All concurred.