Tara TRACEY, a minor by her parents and natural guardians William TRACEY and Lorraine Tracey, and William and Lorraine Tracey, in their own right

v.

WINCHESTER REPEATING ARMS COMPANY, Western Cartridge Company, Olin Industries, Olin Corporation, Olin Corporation, Winchester Group, U.S. Repeating Arms Company, and John Doe Corporation.

Civ. A. No. 87–0207.

United States District Court,
E.D. Pennsylvania.

Aug. 28, 1990.

Richard E. Genter, Philadelphia, Pa., for plaintiffs.

John J. Hatzell, Jr., Philadelphia, Pa., for defendants.

## MEMORANDUM

O'NEILL, District Judge.

### I. Introduction.

This is a product liability action. Plaintiffs[1] allege that on January 12, 1985 a Winchester Model 1897 shotgun discharged and injured plaintiff Tara Tracey. Plaintiffs' Complaint contains five counts alleging strict liability, negligence, breach of warranty, medical expenses and wanton, reckless and/or intentional misconduct. Defendants[2] have moved for summary judgment on the grounds that they did not manufacture the shotgun in question.

**1.** Plaintiffs in this action are Tara Tracey, a minor by her parents William Tracey and Lorraine Tracey, and William Tracey and Lorraine Tracey in their own right. For the purpose of this Memorandum, I will refer to plaintiffs collectively.

**2.** Defendants Olin Corporation and U.S. Repeating Arms Company have filed this motion for summary judgment.

**3.** Defendants filed their motion for summary judgment on January 26, 1990. After the parties engaged in discovery, plaintiffs filed their response to defendants' motion on May 25, 1990. Also on May 25, 1990, plaintiffs filed their motion for summary judgment on the issue of successor liability. By Order dated June 18, 1990, I *requested that the parties submit briefs* on the application of the "product line" exception to the general rule of successor non-liability in this case. Defendants filed their brief in response to that Order on July 6, 1990. Plaintiffs filed their reply brief on July 20, 1990.

On August 3, 1990, defendants filed a motion to strike certain portions of plaintiffs' July 20, 1990 reply brief. Defendants argue that plaintiffs' reply brief contains arguments which go

Plaintiffs have filed a cross-motion for summary judgment.[3]

Defendants argue that because they are the successors in interest to the corporation which manufactured the shotgun they are not liable under the general rule of successor non-liability. Plaintiffs assert that the Pennsylvania Courts have adopted the "product line" exception to the general rule and that defendants can be liable under this exception. Plaintiffs argue in the alternative that if defendants are not subject to liability under the product line exception they may be liable under other exceptions to the general rule or on a failure to warn theory.

For the reasons that follow, I conclude that defendants are not liable under the rule of successor non-liability. Further, I hold that neither the product line exception to the general rule or any other exception to the rule applies in this case. Finally, I conclude that defendants are entitled to summary judgment on plaintiffs' failure to warn theory.

### II. Undisputed Facts.

The following facts are undisputed. On January 15, 1985, plaintiff Tara Tracey was

beyond the scope of my June 18 Order. Specifically, in addition to responding to defendants' arguments concerning the applicability of the product line exception, plaintiffs' brief argues that defendants may be liable under other exceptions to the general rule and that defendants may be liable for failure to warn. Defendants assert that I should disregard these arguments or provide them with an opportunity to respond. Plaintiffs respond that they have raised no arguments which were not contained in their May 25, 1990 memoranda and that defendants have responded to these arguments in their motion to strike.

Plaintiffs did raise these alternative arguments in their May 25, 1990 motion papers although they provided no argument in support of their positions. *See* Plaintiff's Memorandum of Law in Support of Motion for Summary Judgment filed May 25, 1990, at 14, 36. Moreover, while my June 18, 1990 Order was directed solely to the product line exception issue, in deciding the cross-motions, I must consider all of plaintiffs' arguments for imposing successor liability. Plaintiffs' arguments in their July 20, 1990 submission serve only to define their position on these issues. Therefore, I will deny defendants' motion to strike and will consider plaintiffs' arguments.

injured when a Model 1897 Winchester 12 gauge shotgun (Serial No. 119117C) discharged. A Connecticut corporation, the Winchester Repeating Arms Company ("WRAC–Conn."), manufactured and distributed the shotgun in or about December 1900. WRAC–Conn. manufactured the Model 1897 shotgun from 1897 through December 22, 1931.[4]

On or about February 7, 1929, WRAC–Conn. (later renamed "Winchester Manufacturing Company" by court order on February 21, 1929) was reorganized with its companion company, The Winchester Company, by transferring all of its assets to a newly formed corporation, Winchester Repeating Arms Company of Delaware ("WRAC–Del."). *Final Decree of Foreclosure and Sale*, November 10, 1931, *Chase National Bank of New York v. Winchester Repeating Arms Company, et al.*, In Equity, Consolidated Cause No. 2131 (U.S.D.C. Conn.) (*"Final Decree"*), page 3, ¶ 4; page 4, ¶ 8; pages 19 and 20, ¶¶ 7 and 8. On or about January 22, 1931, a creditors' bill was filed against WRAC–Del. in the United States District Court for the District of Connecticut. *Id.*, pages 7–8, ¶¶ 2–4.

On or about January 22, 1931, the United States District Court for the District of Delaware appointed two receivers for WRAC–Del. *Id.*, page 8, ¶ 4. Subsequent to the appointment of the receivers, the creditors of WRAC–Del. formed two committees, The Bondholders' Protective Committee and The Debenture Holders' Protective Committee. These two committees appointed a Reorganization Committee. On November 3, 1931, the Reorganization Committee submitted to the United States District Court for the District of Connecticut for approval a "Plan and Agreement of Reorganization and Sale of Winchester Repeating Arms Company" ("Reorganization Committee's Plan"). Both the Bondholders' Protective Committee and the Debenture Holders' Committee approved the Reorganization Committee's Plan. *Id.*, pages 70–71, ¶¶ 1–3.

On November 10, 1931, the District Court approved the Reorganization Committee's Plan in its *Final Decree*. The Court made the following relevant findings:

1. That it is apparent that continued operation by the Receivers would not produce revenue sufficient to pay the unpaid interest and principal due and to become due in respect of the Bonds and debentures and other obligations outstanding and the operating and maintenance expenses of [WRAC–Del.]'s properties.

2. That the assets of [WRAC–Del.] are not and will not be of sufficient value to meet its matured liabilities as they mature or accrue and its property herein mentioned and described should be administered and sold and the net proceeds thereof distributed in the manner herein stated.

*Id.*, page 72, ¶¶ 1–2.

As part of the *Final Decree*, the Court entered the following injunction:

All creditors and stockholders of, and claimants against, [WRAC–Del.] and/or [WRAC–Conn], ..., are hereby severally and respectively perpetually enjoined from prosecuting against the Receivers or the Purchaser of any of the property directed to be sold by this decree, or against any nominee or assignee or grantee of such Purchaser, or against any party to the above Consolidated Cause or Constituent Causes or any thereof, or against any person or persons, corporation or corporations, claiming by, under or through them, or any of them, or against any of the property sold pursuant to this decree, any suit or proceeding arising out of, or based on, any obligation or liability of [WRAC–Del.] or [WRAC–Conn.], or otherwise to impose liability upon the Purchaser, or upon any nominee or assignee or grantee of the Purchaser, or upon any party to any of the above-entitled Causes, or upon any person or persons, corporation or corpo-

---

**4.** During this period of time, WRAC–Conn. and/or WRAC–Del. sold a total of 830,721 Mod- el 1897 shotguns.

rations, claiming by, under or through them, or any of them, or upon any property sold pursuant to this decree, in respect of any claim against [WRAC–Del.] or [WRAC–Conn.].

*Id.,* page 97. The *Final Decree* excepted from this injunction "any claims which may accrue after the entry of this decree". *Id.,* page 96.

On December 15, 1931, two individuals, P.C. Beardslee and Ben–Fleming Sessel, purchased substantially all of the manufacturing assets of WRAC–Del. pursuant to the terms of the *Final Decree. See Decree Confirming Sale and Directing Execution and Delivery of Deeds,* December 22, 1931, *Chase National Bank of New York v. Winchester Repeating Arms Company, et al.,* In Equity, Consolidated Cause No. 2131 (U.S.D.C.Conn.) ("Decree Confirming"). Beardslee and Sessel made their bid as pursuant to the *Final Decree* and the Reorganization Committee's Plan. Their bid was the highest bid for WRAC–Del.'s assets. *Decree Confirming,* at pages 3–5, ¶¶ 2–7. Beardslee and Sessel purchased all of WRAC–Del.'s assets for a price of three million dollars ($3,000,000) in cash and four million eight hundred thousand dollars ($4,800,000) par value of stock of the Western Cartridge Company ("WCC").

Beardslee and Sessel subsequently "assigned, transferred and set over" their ownership interest in WRAC–Del. to Winchester Repeating Arms Company of Maryland ("WRAC–Md."). *Decree Confirming,* page 5, ¶ 8. WRAC–Md. was a corporation organized and existing under the laws of Maryland. At the time the transfer of WRAC–Del.'s assets to WRAC–Md. was completed, WRAC–Md. was a wholly-owned subsidiary of WCC. *Minutes, Special Meeting of the Board of Directors of Western Cartridge Company,* December 14, 1931. At no time did either WCC or WRAC–Md. purchase or acquire any of WRAC–Del.'s stock.

After the sale of its assets, WRAC–Del. continued its corporate existence until April 1, 1934 when its charter became void and inoperative due to non-payment of franchise taxes. The Governor of Delaware proclaimed the charter void in January 1935. *See* Letter from Marie C. Shultie, Corporations Administrator, Delaware Department of State to counsel for defendants dated August 27, 1984. WRAC–Md. continued its existence until December 31, 1938, when its corporate existence was dissolved and it became a division of WCC.

On December 31, 1944, Olin Corporation merged into WCC, and the corporate name was changed to Olin Industries, Inc. On August 31, 1954, Olin Industries, Inc. merged with Mathieson Chemical Corporation and its name was changed to Olin Mathieson Chemical Corporation. On September 1, 1969, Olin Mathieson Chemical Corporation changed its name to Olin Corporation, one of the defendants in this action. Olin Corporation or one of its affiliated companies manufactured the Model 1897 shotgun from December 22, 1931 until 1957, when Olin discontinued its manufacture.[5]

On or about July 21, 1981, Olin Corporation sold all of its tangible assets for the domestic manufacturing and selling of firearms to U.S. Repeating Arms Company, a corporation organized and existing under the laws of Connecticut ("USRAC–Conn."). Olin Corporation also granted to USRAC–Conn. a license for the use of the "Winchester" trademark in connection with the manufacture and sale of certain firearms.

On or about December 29, 1987, pursuant to a plan of reorganization for USRAC–Conn. under Chapter 11 of the Bankruptcy Code, USRAC–Conn. transferred its tangible and intangible assets to Hew Haven Arms Company, Inc. ("HNAC"), a corporation organized and existing under the laws of Massachusetts. HNAC later changed its name to U.S. Repeating Arms Company.

### III. Standard for Summary Judgment.

Under Fed.R.Civ.P. 56(c), summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affida-

---

**5.** During this period of time, Olin Corporation or one of its affiliated companies sold a total of 193,979 Model 1897 shotguns.

vits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Rule 56(e) provides that when a properly supported motion for summary judgment is made, "an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial."

■■ Under Rule 56, summary judgment will be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The party moving for summary judgment has the burden of demonstrating that there is an absence of a genuine issue of material fact. *Id.*, at 322–23, 106 S.Ct. at 2552. If the moving party sustains this burden, the nonmoving party must set forth facts demonstrating the existence of a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986). An issue of material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*, at 248, 106 S.Ct. at 2510. All doubts must be resolved in favor of the nonmoving party. *Id.*, at 255, 106 S.Ct. at 2513. In addition, "the existence of disputed issues of material fact should be ascertained by resolving 'all inferences, doubts and issues of credibility against the moving party.'" *Ely v. Hall's Motor Transit Co.*, 590 F.2d 62, 66 (3d Cir.1978) (quoting *Smith v. Pittsburgh Gage & Supply Co.*, 464 F.2d 870, 874 (3d Cir.1972)).[6]

## IV. Discussion.

### A. *The 1931 Final Decree does not Bar Plaintiffs' Claims.*

■ Defendants' motion for summary judgment argues that the injunction which the District Court entered in the 1931 Final Decree bars plaintiffs' claims. This argument is without merit. The Final Decree specifically exempts from the injunction "any claims which may accrue after the entry of this decree". *Final Decree*, page 96. Tara Tracey sustained her injury in 1985.

### B. *Olin Corporation is Entitled to Summary Judgment on the Applicability of the "Product Line" Exception to this Case.*

■ The parties agree that Pennsylvania law governs this action.[7] The parties also agree that under Pennsylvania law, it is a "well-settled rule ... [that] where one company sells or transfers all of its assets to another, the second entity does not become liable for the debts and liabilities, including torts, of the transferor." *Conway v. White Trucks, Div. of White Motor Corp.*, 885 F.2d 90, 93 (3d Cir.1989) (quoting *Polius v. Clark Equipment Co.*, 802 F.2d 75, 77 (3d Cir.1986) (citing 15 W. Fletcher, *Cyclopedia of the Law of Private Corporations* § 7122 (Perm.Ed.1983))). *Accord Husak v. Berkel, Inc.*, 234 Pa.Super. 452, 341 A.2d 174, 176 (1975).

Plaintiffs argue that, the general rule notwithstanding, defendants can be held liable under Pennsylvania law under the "product line" exception to the rule. Defendants respond that the Pennsylvania Supreme Court has never adopted the "product line" exception. Defendants argue in the alternative that assuming that Pennsylvania has adopted this exception it does not apply in this case.

### 1. Would the Pennsylvania Supreme Court Adopt the Product Line Exception to the General Rule of Successor Non–Liability?

In *Dawejko v. Jorgensen Steel Co.*, 290 Pa.Super. 15, 434 A.2d 106 (1981), the

---

6. *See also Bracey v. Keene Corp., et al.*, C.A. No. 86–6830, slip. op. at 3, 1989 WL 156380 (E.D.Pa. December 18, 1989).

7. The parties have not raised a choice of law issue in this case.

Pennsylvania Superior Court followed the holding of those Courts which have adopted the "*product line*" exception, which bases liability on a successor's continued marketing of the predecessor's product. *Id.*, 434 A.2d at 107–08 (citing *Ray v. Alad Corp.*, 19 Cal.3d 22, 136 Cal.Rptr. 574, 560 P.2d 3 (1977) (tort concept of risk spreading mandated finding that successor who continues to market a product line purchased from predecessor assumes predecessor's liabilities for defective products); *Ramirez v. Amsted Indus., Inc.*, 86 N.J. 332, 431 A.2d 811 (1981) (adopting product line exception)).

The *Dawejko* Court believed it better "not to phrase the new exception too tightly." *Dawejko*, 434 A.2d at 111. Instead, the Court held that the application of the exception should turn on whether, in the particular case, "it is just to impose liability on the successor corporation", *id.*, and noted specifically that a number of factors are relevant to this inquiry including the three-part test which the *Ray* Court adopted. *Id.* These relevant factors include whether the successor advertised itself as an ongoing enterprise, whether it maintained the same personnel, property, and clients, whether it acquired the predecessor's name and good will, and whether it required the predecessor to dissolve. *Id.* The three-part *Ray* test to which the *Dawejko* Court referred states:

> [j]ustification for imposing strict liability upon a *successor* to a manufacturer … rests upon (1) the virtual destruction of the plaintiff's remedies against the original manufacturer caused by the successor's acquisition of the business, (2) the

successor's ability to assume the original manufacturer's risk-spreading role, and (3) the fairness of requiring the successor to assume a responsibility for defective products.

*Ray*, 136 Cal.Rptr. at 579–80, 560 P.2d at 8–9 (emphasis in original). Finally, the *Dawejko* Court adopted the *Ramirez* Court's formulation of the exception, which states that:

> [W]here one corporation acquires all or substantially all the manufacturing assets of another corporation, even if exclusively for cash, and undertakes the same manufacturing operation as the selling corporation, the purchasing corporation is strictly liable for injuries caused by defects in units of the same product line, even if previously manufactured and distributed by the selling corporation or its predecessor.

*Dawejko*, 434 A.2d at 110–11 (citing *Ramirez*, 431 A.2d at 825).

The Pennsylvania Supreme Court has not addressed the product line exception. As subject matter jurisdiction in this action is based upon diversity of citizenship, I must predict whether the Pennsylvania Supreme Court would adopt the exception. *Conway*, 885 F.2d at 94.

In *Conway*, the Court of Appeals for the Third Circuit stated that it was "uncertain whether the Pennsylvania Supreme Court would adopt the product line exception in any form." *Id.*, at 94–95. The *Conway* Court noted that only three state Supreme Courts have adopted the product line exception,[8] *id.*, at 95, while a number of state and federal courts have declined to adopt the exception.[9] *Id.*, at 95. Sitting in its

---

**8.** The three state Supreme Courts which have adopted the product line exception are California, *see Ray, supra,* New Jersey, *see Ramirez, supra,* and Washington, *see Martin v. Abbott Laboratories,* 102 Wash.2d 581, 689 P.2d 368 (1984) (en banc).

**9.** *See Florum v. Elliott Mfg.,* 867 F.2d 570, 578–81 (10th Cir.) (applying Colorado law), *reh'g denied,* 879 F.2d 801 (1989); *Conn v. Fales Div. of Mathewson Corp.,* 835 F.2d 145, 147–48 (6th Cir.1987) (applying Kentucky law); *Dayton v. Peck, Stowe & Wilcox Co.,* 739 F.2d 690, 694 (1st Cir.1984) (applying Massachusetts law); *Western Helicopter Services, Inc. v. Rogerson Aircraft*

*Corp.,* 728 F.Supp. 1506, 1511 (D.Or.1990) (applying Oregon law); *Giraldi v. Sears, Roebuck & Co.,* 687 F.Supp. 987, 991–92 (D.Md.1988) (applying Maryland law); *Niccum v. Hydra–Tool Corp.,* 438 N.W.2d 96, 99 (Minn.1989); *Simoneau v. South Bend Lathe, Inc.,* 130 N.H. 466, 543 A.2d 407, 409 (1988); *De Lapp v. Xtraman, Inc.,* 417 N.W.2d 219, 222 (Iowa 1987); *Flaugher v. Cone Automatic Machine Co.,* 30 Ohio St.3d 60, 507 N.E.2d 331, 337 (1987); *Hamaker v. Kenwel–Jackson Machine, Inc.,* 387 N.W.2d 515, 519–20 (S.D.1986); *Young v. Fulton Iron Works Co.,* 709 S.W.2d 927, 940 (Mo.Ct.App.1986); *Bullington v. Union Tool Corp.,* 254 Ga. 283, 328 S.E.2d 726, 728 (1985); *Fish v. Amsted Indus-*

capacity as the Supreme Court of the Virgin Islands, the Court of Appeals for the Third Circuit has declined to adopt the product line exception. *Polius v. Clark Equipment Co.*, 802 F.2d 75, 82 (1986).[10]

I join in the *Conway* Court's hesitancy in predicting the action of the Pennsylvania Supreme Court concerning the product line exception. As noted above, *see, supra,* n. 9, the majority of Courts which have addressed this issue have declined to adopt the exception and a number of commentators have criticized its rationale.[11] However, prior to *Conway,* Courts of this Circuit have held that Pennsylvania has adopted the exception. *See Philadelphia Electric Co. v. Hercules, Inc.,* 762 F.2d 303, 309 (3d Cir.), *cert. denied,* 474 U.S. 980, 106 S.Ct. 384, 88 L.Ed.2d 337 (1985); *Whitmore v. Bobst Group, Inc.,* 668 F.Supp. 421, 429 (E.D.Pa.1987); *Catasauqua Area School District v. Raymark Industries, Inc.,* 662 F.Supp. 64, 68 (E.D.Pa. 1987); *Shorb v. Airco, Inc.,* 644 F.Supp. 923, 927 (E.D.Pa.1986); *Turner v. Mudrick Machine Works,* 589 F.Supp. 771, 775 (E.D. Pa.1984); *McClinton v. Rockford Punch Press and Manufacturing Co., Inc.,* 549 F.Supp. 835, 837, n. 1 (E.D.Pa.1982); *Amader v. Pittsburgh Corning Corp.,* 546 F.Supp. 1033, 1036 (E.D.Pa.1982). Moreover, in *Conway,* the Court assumed that Pennsylvania would follow the exception. *Conway,* 885 F.2d at 95. Accordingly, for the purpose of this discussion, I will assume that the Pennsylvania Supreme Court would follow *Dawejko* and adopt the product line exception.

2. The Pennsylvania Supreme Court Would Require as an Essential Element of the Product Line Exception that the Successor Corporation Cause or Contribute to the Claimant's Inability to Recover Against the Predecessor.

In *Conway* the Court of Appeals assumed for the purpose of its decision that the Pennsylvania Supreme Court would follow *Dawejko* but predicted that "it would not apply such an exception in cases where the claimant had a potential remedy against the original manufacturer, but failed to exercise all available means to assert his or her claim." *Conway,* 885 F.2d at 95. In discussing its prediction, the Court noted that "... many of the cases analyzing the applicability of successor liability have emphasized the *Ray* requirement *that the asset transfer must have caused the destruction of plaintiff's remedy." Id.* (citing *Santa Maria v. Owens–Illinois, Inc.,* 808 F.2d 848, 859 (1st Cir.1986) (emphasis added)).

In this case, defendants argue that WCC's actions in purchasing the assets of WRAC–Del. at a judicial sale did not cause the destruction of plaintiffs' remedies against WRAC–Del. and therefore that, even if available, the product line exception does not apply in this case. Plaintiffs respond that the causation element is only one factor which the Courts consider in determining whether the product line exception applies. Plaintiffs also argue that if the causation element is a prerequisite to the application of the exception, it has been established in this case. To resolve this issue, I must determine whether, assuming

*tries, Inc.,* 126 Wis.2d 293, 376 N.W.2d 820, 828 (1985); *Griggs v. Capitol Machine Works, Inc.,* 690 S.W.2d 287, 294 (Tex.Ct.App.1985); *Goucher v. Parmac, Inc.,* 694 P.2d 953, 954 (Okla.Ct.App. 1984); *Downtowner, Inc. v. Acrometal Products, Inc.,* 347 N.W.2d 118, 123 (N.D.1984); *Ostrowski v. Hydra–Tool Corp.,* 144 Vt. 305, 479 A.2d 126, 127 (1984); *Gonzalez v. Rock Wool Engineering & Equipment Co., Inc.,* 117 Ill.App.3d 435, 72 Ill.Dec. 917, 921, 453 N.E.2d 792, 796 (1983); *Schumacher v. Richards Shear Co., Inc.,* 59 N.Y.2d 239, 451 N.E.2d 195, 198–99, 464 N.Y. S.2d 437, 440–41 (1983); *Bernard v. Kee Manufacturing Co., Inc.,* 409 So.2d 1047, 1049 (Fla. 1982); *Jones v. Johnson Machine & Press Co.,*

211 Neb. 724, 320 N.W.2d 481, 484 (1982); *Pelc v. Bendix Machine Tool Corp.,* 111 Mich.App. 343, 314 N.W.2d 614, 620 (1981).

**10.** The *Polius* Court engaged in an extensive discussion of what it termed "the serious shortcomings in the reasoning used to support" the product line exception. *See Polius,* 802 F.2d at 78–83.

**11.** *See, e.g.,* Green, *Successor Liability: The Superiority of Statutory Reform to Protect the Products Liability Claimant,* 72 Cornell Law Rev. 17 (1986).

that the Pennsylvania Supreme Court would adopt the product line exception, the Court would require that the asset purchaser's actions cause the destruction of the plaintiffs' remedies.

The causation element of the product line exception is part of the first *Ray* factor. In *Ray*, the successor purchased the predecessor's assets pursuant to a written sales contract which required the predecessor to dissolve. The purchase of all assets and the required dissolution eliminated the possibility of recovery from the predecessor. In holding that the plaintiff could recover from the successor, the *Ray* Court held the first "justification" for imposing successor liability rests upon "the virtual destruction of the plaintiff's remedies against the original manufacturer *caused by the successor's acquisition of the business*." *Ray*, 136 Cal.Rptr. at 579–80, 560 P.2d at 8 (emphasis added).

In *Martin, supra*, n. 8, the Washington Supreme Court (en banc) adopted the *Ray* formulation of the product line exception. In *Hall v. Armstrong Cork, Inc.*, 103 Wash.2d 258, 692 P.2d 787 (1984) (en banc), the same Court held that:

> A key premise of the product line exception is that successor liability is only appropriate when the successor corporation by its acquisition actually played some role in curtailing or destroying the claimants' remedies. In such a way, the product line rule strikes a balance between the competing concerns of products liability and a corporation's need to limit its risk of exposure.

*Id.*, 692 P.2d at 792. Two decisions of the Court of Appeals of California have approved the *Hall* Court's statement of the causation rule. *See Lundell v. Sidney Machine Tool Co.*, 190 Cal.App.3d 1546, 236 Cal.Rptr. 70, 75 (2nd Dist.1987); *Kaminski v. Western MacArthur Co.*, 175 Cal.App.3d 445, 220 Cal.Rptr. 895, 902 (1st Dist.1985).

A number of federal courts have held that the causation element of *Ray* is an essential prerequisite to the application of the product line exception. In *In re Related Asbestos Cases*, 578 F.Supp. 91 (N.D. Cal.1983), the Court held that *Ray* "re-

quires an element of causation; a successor corporation cannot be held liable for the product liability torts of its predecessor unless there is a showing that the successor caused—or at least contributed to—the plaintiff's inability to recover against the predecessor." *Id.*, at 92–93. *Accord Reed v. Armstrong Cork Co.*, 577 F.Supp. 246 (E.D.Ark.1983).

In *Kline v. Johns–Manville*, 745 F.2d 1217 (9th Cir.1984), the Court of Appeals for the Ninth Circuit held that, under *Ray*, for the exception to apply, the asset sale to the successor corporation must "contribute to the destruction of the plaintiff's remedies." *Id.*, at 1220. The *Kline* Court held that the first *Ray* factor "requir[es] not only that the plaintiff lack an effective remedy against the predecessor, but also that 'the successor corporation actually [have] played some role in curtailing or destroying the plaintiffs' remedies.'" *Id.*, at 1219.

The Court of Appeals for the Ninth Circuit further developed the causation element of the exception in *Nelson v. Tiffany Industries, Inc.*, 778 F.2d 533 (9th Cir. 1985). In *Nelson*, the plaintiff brought a personal injury action alleging injuries resulting from a grain auger accident in Minnesota. Moody Manufacturing Company manufactured the auger in 1966. In January 1970, Moody filed a voluntary petition for reorganization under Chapter 11. In April 1970 defendant Tiffany Industries, Inc. purchased all of Moody's assets in a bankruptcy Court-approved sale. Moody did not emerge from the reorganization proceedings as a viable corporate entity. The plaintiff sustained his injuries seven years later.

The *Nelson* plaintiff argued that the *Ray* exception permitted him to recover against Tiffany. While noting the similarities between the plaintiff's case and *Ray*, the Court focussed on *Ray*'s causation requirement:

> ... Moody's *voluntary* petition for reorganization, as contrasted with the contractual requirement that [the predecessor corporation in *Ray*] dissolve its corporate existence as a condition of the

sale of its assets in *Ray*, clearly distinguishes the two cases. In *Ray*, the California Supreme Court recognized that the requirement that [the predecessor corporation] cease its corporate existence destroyed the plaintiff's remedies. In this case, however, Moody had filed its petition and was no longer in business before the bankruptcy court approved the sale of assets to Tiffany. Thus, it was Moody's bankruptcy and not Tiffany's subsequent purchase of the assets that destroyed Nelson's remedies. Even if there had been no sale of assets to Tiffany, Nelson would not be in any better position today to proceed against Moody.

Absent an agreement that causes the plaintiff's loss of remedy, the *Ray* exception to the general rule that a successor corporation is not liable for its predecessor's torts does not apply.

*Nelson*, 778 F.2d at 537 (emphasis in original) (footnote omitted) (citation omitted).[12] Thus, the Courts which have addressed the causation issue have held that causation is an essential element of the product line exception.[13]

The Pennsylvania Courts have not considered whether the causation element is a prerequisite to the application of the product line exception. Nor did the Court of Appeals for the Third Circuit resolve the issue in *Conway, supra.*[14] Therefore, I must predict whether the Pennsylvania Supreme Court would adopt such a requirement.

Neither the *Martin* nor the *Nelson* Court discussed the rationale underlying its adoption of a causation element. One rationale for requiring a showing of causation in cases involving bankruptcy proceedings such as *Nelson* is a practical one. If the product line exception were applied, prospective purchasers might be deterred from bidding on the bankrupt's assets or might demand a downward adjustment in the sale price paid for the assets of the estate. While such a reduction in price or refusal to purchase would not be a problem in the case of an asset purchase involving

---

**12.** The *Nelson* Court also noted that "Where, as here, the predecessor corporation files a voluntary petition in bankruptcy *before* the successor's purchase of assets, the essential element of causation will be shown by evidence of a collusive agreement to use bankruptcy proceedings to shield the successor corporation from the predecessor's liabilities." *Nelson*, 778 F.2d at 537. Plaintiffs in this action do not assert that the 1931 proceedings were a sham designed to protect WCC from WRAC–Del.'s liabilities.

**13.** One text on product liability law has summarized the causation requirement:

It is an essential condition precedent to imposition of liability on a successor manufacturer under the theory of product line continuation that there be an elimination by the successor of an effective remedy against the predecessor. A key premise of the product line exception is that successor liability is only appropriate when the successor by its acquisition actually played some role in curtailing or destroying the claimant's remedies.... Thus, imposition of liability under the product line exception is precluded where: ... the plaintiff's remedies against the predecessor were destroyed by the predecessor corporation's decision to file for bankruptcy and not because of any action of the successors.

*American Law of Product Liability 3d*, Vol 1, § 7.16 (1987) (Lawyers Cooperative Publishing Company) (footnotes omitted).

**14.** In their reply brief filed in response to my Order of June 18, 1990, plaintiffs state that:

The *Conway* court went on to predict that the Pennsylvania Supreme Court, if it were to adopt the product line exception, would require the virtual destruction of plaintiff's remedies *against the original manufacturer caused by the successor's acquisition.* In essence, then, the Third Circuit's pronouncement in *Conway* stands for the prediction that the Pennsylvania Supreme Court will make the first part of the three part test set forth in [*Ray*] an element of the product line test and not merely a useful consideration....

Plaintiffs' Reply Brief in Support of Motion for Summary Judgment, at 10–11. Although the defendants have labelled this statement a "critical concession", *see* [Defendants'] Memorandum in Support of [ ] Motion to Strike Portions of "Plaintiffs' Reply Brief in Support of Motion for Summary Judgment", *Conway* did not make such a prediction.

As noted above, *see,* discussion, *supra,* at 1105–06, the *Conway* Court held only that the product line exception does not apply in cases in which the claimant had a remedy against the original manufacturer but failed to pursue such claim. *Conway,* 885 F.2d at 95. The Court's subsequent discussion of the causation element was in support of this holding alone, and cannot be construed as predicting the Pennsylvania Supreme Court's position on the causation element.

two solvent corporations, it might be a problem in the bankruptcy context because any diminution in the value of the salable assets would be borne by the bankrupt corporation's creditors.

A more fundamental rationale for adopting a causation requirement stems from the policies which underlie Section § 402A of the Restatement (Second) of Torts. Comment c to § 402A states that the justification for strict liability "has been said to be that a seller ... has undertaken and assumed a special responsibility" toward the user, that the public has the right to "rely upon the seller, that reputable sellers will stand behind their goods," and that the proper persons to afford protection to consumers "are those who market the products."

In *Polius, supra,* the Court noted that through Comment c the Restatement "reaffirms the notion of a causal connection between the defendant's acts and the plaintiff's injuries—a concept which is fundamental to tort law." *Polius,* 802 F.2d at 81. *See also Prosser & Keeton on Torts* (5th ed. 1984 & 1988 Supp.), at 263 ("An essential element of the plaintiff's cause of action ... for any ... tort[ ] is that there be some reasonable connection between the act or omission of the defendant and the damage which the plaintiff has suffered.") Moreover, the *Polius* Court stated that the product line exception theory "brush[es] aside this bedrock requirement and impose[s] liability on entities which in fact had no connection with the acts causing injury." *Polius,* 802 F.2d at 81 (footnote omitted). Thus, while manufacturers, wholesalers and retailers who market defective products all have some causal connection with a claimant's injury, a successor corporation which simply manufactures the same line of products as did its predecessor has no causal connection to the allegedly defective product which caused the plaintiff's injuries. Absent an element of causation, there can be no liability under § 402A.

In order for the product line exception to be consistent with the policies which underlie strict liability in tort the exception must include an element of causation. That is, the conduct of the successor corporation must have some reasonable connection with the claimant's injuries. Therefore, I predict that if the Pennsylvania Supreme Court were to adopt the product line exception, it would follow *Nelson* and require as a prerequisite to applying the exception some showing of causation.

In this case, this essential element is not present. The corporate minutes of WRAC–Del. dated January 19, 1931 state that the WRAC–Del. president:

> pointed out that consenting now to an equity receivership would conserve the present cash situation, would permit the business to be carried on under the protection of the court, and ... that in his opinion the likelihood of being able to work out a fair an equitable plan of reorganization would be greater by consenting to a receivership...."

WRAC–Del. Minutes of January 19, 1931, at 1. On January 22, 1931, the United States District Court for the District of Connecticut, with the approval and pursuant to the request of WRAC–Del., placed WRAC–Del. into receivership. *Final Decree,* page 8, ¶ 3.

On November 10, 1931, the District Court approved the WRAC–Del. Plan of Reorganization, and stated:

> 1. That it is apparent that continued operation by the Receivers would not produce revenue sufficient to pay the unpaid interest and principal due and to become due in respect of the Bonds and debentures and other obligations outstanding and the operating and maintenance expenses of [WRAC–Del.]'s properties.
>
> 2. That the assets of [WRAC–Del.] are not and will not be of sufficient value to meet its matured liabilities as they mature or accrue and its property herein mentioned and described should be administered and sold and the net proceeds thereof distributed in the manner herein stated.

*Id.,* page 72, ¶¶ 1–2. The Court entered an injunction barring any suits against WRAC–Del. *Id.,* page 97.

It is apparent from these facts that WRAC–Del. voluntarily placed itself into receivership because of its financial condition. As of January 22, 1931, WRAC–Del. was insolvent. The parties do not dispute that plaintiffs' remedies against WRAC–Del. were extinguished as of the date of the *Final Decree.* WCC's asset purchase had nothing to do with WRAC–Del.'s financial difficulties. Nor did WCC as a condition of its asset purchase require WRAC–Del. to dissolve. Thus, the record establishes that the plaintiffs' remedies against WRAC–Del. were destroyed by WRAC–Del.'s decision to place itself into receivership and not because of any action of WCC. Even if there had been no sale of WRAC–Del.'s assets to WCC, plaintiffs would not be in any better position today to proceed against WRAC–Del. Under these facts, the product line exception does not apply to defendants.[15]

C. *Olin Corporation Cannot be Held Liable Under Any Other Exception to the General Rule of Successor Non-liability.*

■ In addition to the product line exception to the general rule of successor non-liability, Pennsylvania recognizes four other exceptions. The successor may be held liable where: (1) the purchaser expressly or impliedly agrees to assume the obligations of the predecessor; (2) the transaction amounts to a consolidation or merger; (3) the purchasing corporation is merely a continuation of the predecessor; or (4) the transaction is fraudulent and intended to escape liability. *Husak,* 341 A.2d at 176.[16] *Accord, Dawejko,* 434 A.2d at 107; *Polius,* 802 F.2d at 78; *Hercules,* 762 F.2d at 308–09.

Plaintiffs argue that the transaction between WRAC–Del. and WCC, while not rising to the level of a merger or consolidation, was a *de facto* merger and, in the alternative, that the transaction was a consolidation.[17] For the reasons that follow, I conclude that neither of these exceptions applies in this case.

■ In determining whether a transaction constitutes a *de facto* merger, the courts look to the following factors:

(1) There is a continuation of the enterprise of the seller corporation, so that there is continuity of management, personnel, physical location, assets, and general business operations.

(2) There is a continuity of shareholders which results from the purchasing corporation paying for the acquired assets with shares of its own stock, this stock ultimately coming to be held by the shareholders of the seller corporation so that they become a constituent part of the purchasing corporation.

(3) The seller corporation ceases its ordinary business operations, liquidates, and dissolves as soon as legally and practically possible.

(4) The purchasing corporation assumes those obligations of the seller ordinarily necessary for the uninterrupted continuation of normal business operations of the seller corporation.

*Hercules,* 762 F.2d at 310 (quoting *Philadelphia Electric Co. v. Hercules, Inc.,* 587 F.Supp. 144, 151–152 (E.D.Pa.1984) (footnote omitted) (citing *Shannon v. Samuel Langston Company,* 379 F.Supp. 797, 801 (W.D.Mich.1974); *McKee v. Harris–Seybold Co., Div. of Harris–Int. Corp.,* 109 N.J.Super. 555, 264 A.2d 98, 103–105 [ (Law Div.1970) ], *aff'd,* 118 N.J.Super. 480, 288

---

**15.** I note that at least one Court has held that the product line exception is only available where the predecessor corporation is answerable in strict liability, and the exception does not apply to allegations sounding in negligence. *Rawlings v. D.M. Oliver, Inc.,* 97 Cal.App.3d 890, 159 Cal.Rptr 119 (4th Dist.1979). Thus, although I need not decide the issue, I question whether, if the product line exception were applicable in this case, plaintiffs could pursue any of their claims other than their strict liability claim.

**16.** I note that none of the cases the *Husak* Court cited in support of these exceptions emanated from the Pennsylvania Supreme Court. *See Conway,* 885 F.2d at 93.

**17.** Plaintiffs do not contend that the WRAC–Md. expressly or impliedly agreed to assume the obligations of WRAC–Del. or that the transaction was fraudulent and intended to escape liability.

A.2d 585 (App.Div.1972)), *aff'd*, 762 F.2d 303 (3rd Cir.1985)).

One of these elements is not present in this case: a continuity of shareholders resulting from the acquiring corporation paying for the acquired assets with shares of its own stock. The generally accepted rule is that " '[a] consolidation or merger always involves a transfer of the assets and business of one corporation to another in exchange for its securities.' " *Bud Antle, Inc. v. Eastern Foods, Inc.*, 758 F.2d 1451, 1458 (11th Cir.1985) (applying Georgia law) (quoting *Good v. Lackawanna Leather Co.*, 96 N.J.Super. 439, 233 A.2d 201, 208 (Ch.Div.1967)). "At the very least, there must be some sort of continuation of the stockholders' ownership interests." *Bud Antle*, 758 F.2d at 1458 (citing *Atlas Tool Co. v. Commissioner*, 614 F.2d 860, 871 (3d Cir.), *cert. denied*, 449 U.S. 836, 101 S.Ct. 110, 66 L.Ed.2d 43 (1980)). *See also Leannais v. Cincinnati, Inc.*, 565 F.2d 437 (7th Cir.1977) (applying Wisconsin law); *Travis v. Harris Corp.*, 565 F.2d 443 (7th Cir.1977) (applying Ohio and Indiana law).

There is no such continuity of stock ownership in this case. The transfer of WCC stock to WRAC–Del. in payment for the assets of WRAC–Del. was used exclusively to satisfy WRAC–Del.'s creditors. The total amounts paid were insufficient to compensate WRAC–Del.'s creditors fully and the payments were made pursuant to judicial approval. Plaintiffs have identified no facts which demonstrate that WCC stock

was transferred to WRAC–Del.'s shareholders through the asset purchase. Nor were any sums of cash transferred to WRAC–Del.'s shareholders. *See Decree Confirming*, at 15. The stockholders of WRAC–Del. did not, therefore, become stockholders of WCC as a result of the asset sale.[18] Absent this essential element, the *de facto* merger exception does not apply in this case.[19]

■ Plaintiffs cursory argument[20] that the defendants may be held liable under the "mere continuation" theory fails for similar reasons. "The key element of a 'continuation' is a common identity of stock, directors and stockholders in the selling and purchasing corporations." *Bud Antle*, 758 F.2d at 1459 (quoting *Leannais*, 565 F.2d at 440). *Accord, Travis*, 565 F.2d at 447; *Tucker v. Paxson Machine Co.*, 645 F.2d 620, 625–26 (8th Cir.1981) (applying Missouri law); *Dayton*, 739 F.2d at 693; *Polius*, 802 F.2d at 86 (Mansmann, J., dissenting). *See also Florum*, 867 F.2d at 579 (Court refuses to expand the continuation exception beyond cases in which there is "a common identity of officers, directors and shareholders.").

As I have previously noted, there is no evidence which demonstrates any continuity of shareholders in this case. In contrast, the undisputed evidence demonstrates that no shares of WCC stock were transferred to WRAC–Del. shareholders as

---

**18.** Plaintiffs' statement that "John Olin, F.W. Olin and Otto Gnerich, officers and directors of WCC, all became shareholders of the original manufacturer", Plaintiffs' Reply Brief in Support of Motion for Summary Judgment at 27, is confusing. Assuming that the Olins and Gnerich did become shareholders in WRAC–Del., such a fact is immaterial to the application of the *de facto* merger doctrine in this case. The essential inquiry in the *de facto* merger context is whether the shareholders of the predecessor corporation become shareholders of the successor through the successor's use of stock in payment for the predecessor's assets. Thus, the question is whether the shareholders of WRAC–Del. became shareholders of WCC as a result of the asset purchase, not whether shareholders of WCC became shareholders of WRAC–Del.

**19.** Plaintiffs argue that "[t]he fact that the stockholders of WRAC–Del. were required to use the

stock to pay creditors of WRAC–Del. is inconsequential. Here, the 'continuity of shareholder' requirement is still met." Plaintiffs' Reply Brief in Support of Motion for Summary Judgment, at 27 n. 7. This statement is incorrect. The continuity of shareholder element requires that the shareholders of the predecessor corporation become shareholders of the successor corporation as a result of the sale. The facts of this case demonstrate that because the WCC stock was used to satisfy the debts of WRAC–Del., no such continuity of shareholders ensued from the asset purchase.

**20.** Plaintiffs' argument for the application of the mere continuation theory is presented in one and one-quarter pages of their reply brief. *See* Plaintiffs' Reply Brief in Support of Motion for Summary Judgment, at 28–29.

a result of asset purchase. Moreover, plaintiffs have produced no evidence to demonstrate that the officers and directors of WRAC–Del. became officers and directors of WRAC–Md. or WCC. While WCC and its successors may have held themselves out as a continuation of WRAC–Del., this fact alone is insufficient to justify imposing liability under the continuation exception to the general rule.[21]

### D. Olin Corporation is Entitled to Summary Judgment on Plaintiffs' Failure to Warn Theory.

[8] As an alternate ground for imposing liability, plaintiffs argue that Olin's liability can arise from breach of a duty to warn. Like the product line exception, the Pennsylvania Supreme Court has not spoken on the issue whether a duty to warn can be imposed on a successor corporation such as Olin which is not subject to transfer liability. Nor have any federal Courts construing Pennsylvania law decided the issue. However, a number of federal and state courts have held that under certain circumstances successor corporations may be held liable for failing to warn of defects in a predecessor's product.[22] I predict that if the Pennsylvania Supreme Court were to address the issue it would hold that under certain circumstances a successor may be liable for failing to warn of defects in a predecessor's product.

The Courts which have adopted the failure to warn theory in the successor liability context have held that, under traditional tort principles, a successor's duty to warn "is not dependent upon the terms of the purchase and sale agreement between the predecessor and successor corporations." *Florum*, 867 F.2d at 577 (citing *Leannais*, 565 F.2d at 441–442). Succession alone does not impose a duty to warn the predecessor's customers of recently discovered defects. *Florum*, 867 F.2d at 577 (citing *Gee*, 615 F.2d at 866). "The successor corporation's liability stems not from its status as a successor, but from its establishment of a relationship with the customer that imposed certain duties and responsibilities." *Polius*, 802 F.2d at 84. Accord, *Florum*, 867 F.2d at 577; *Mozingo*, 752 F.2d at 177; *Travis*, 565 F.2d at 448–49.

The *Polius* Court noted that the successor duty to warn doctrine "is still in its developmental stage". *Polius*, 802 F.2d at 84. The Court further stated that,

... the courts adopting [the failure to warn theory in the successor corporation context] have looked to such factors as succession to service contracts, coverage of the particular machine by contract, service of that machine by the successor, and the successor's knowledge of the defect and of the machine owner's location.

*Id.* (citing *Tucker*, 645 F.2d at 626; *Travis*, 565 F.2d at 449; *Leannais*, 565 F.2d at 442). Accord, *Florum*, 867 F.2d at 577; *Tucker*, 645 F.2d at 626. I predict that the

---

21. Plaintiffs do not argue that Pennsylvania has or would adopt any of the more liberal "continuation" theories. *See, e.g., Cyr v. B. Offen & Co.*, 501 F.2d 1145, 1151–53 (1st Cir.1974) and *Turner v. Bituminous Casualty Co.*, 397 Mich. 406, 244 N.W.2d 873 (1976). *See also Polius*, 802 F.2d at 86–88 (Mansmann, J. dissenting). I note that in *Conway*, the Court stated that

Cyr is no longer good law in light of the New Hampshire Supreme Court's express rejection of its reasoning. *See Simoneau v. South Bend Lathe, Inc.*, 130 N.H. 466, 543 A.2d 407, 408–09 (1988) (since New Hampshire does not recognize risk shifting as a basis for strict liability, there is no justification for adopting an exception to the successor nonliability rule on a risk shifting theory).

*Conway*, 885 F.2d at 93.

22. *See, e.g., Florum*, 867 F.2d at 577; *Polius*, 802 F.2d at 84; *Travis*, 565 F.2d at 448–49; *Lean-

nais*, 565 F.2d at 441–442; *Tucker*, 645 F.2d at 626; *Mozingo v. Correct Manufacturing Corp.*, 752 F.2d 168, 177 (5th Cir.1985) (applying Mississippi law); *Gee v. Tenneco, Inc.*, 615 F.2d 857, 866 (9th Cir.1980) (applying California law); *Shane v. Hobam, Inc.*, 332 F.Supp. 526, 528–30 (E.D.Pa.1971) (applying New York law); *Downtowner*, 347 N.W.2d at 125; *Ostrowski*, 479 A.2d at 127–28; *Schumacher*, 451 N.E.2d at 199, 464 N.Y.S.2d at 440–41; *Stratton v. Garvey International, Inc.*, 9 Kan.App.2d 254, 676 P.2d 1290, 1294–95 (1984); *Gonzalez v. Rock Wool Engineering & Equip. Co.*, 117 Ill.App.3d 435, 72 Ill.Dec. 917, 920, 453 N.E.2d 792, 795 (1st Dist. 1983); *Nieves v. Bruno Sherman Corp.*, 86 N.J. 361, 431 A.2d 826, 832–33 (1981); *Andrews v. John E. Smith's Sons Co.*, 369 So.2d 781, 784–85 (Ala.1979); *Wilson v. Fare Well Corp.*, 140 N.J. Super. 476, 356 A.2d 458, 467–68 (1976).

Pennsylvania Supreme Court would adopt these factors as relevant in this context.

The courts which have held that successor corporations may be liable for failure to warn of defects in a predecessor's product have emphasized that the relationship which gives rise to this duty is between the successor corporation and the *particular* allegedly defective product. In *Florum*, the Court reversed an entry of summary judgment in favor of the defendant on a failure to warn theory. The Court noted that the plaintiff had produced evidence that the successor corporation succeeded to the predecessor's service contracts, provided parts and service to the particular crane involved in the plaintiff's injuries and knew the name of the customer and the location of the machine. *Florum*, 867 F.2d at 577. The Court held that this "specific relationship" between the plaintiff's employer and the successor corporation required the grant of summary judgment to be reversed. *Id.*

In contrast to the specific relationship which the Court recognized in *Florum*, the Court in *Tucker* held that summary judgment in favor of a defendant successor corporation was appropriate in a case in which the plaintiff made no allegations that the successor inherited any of its predecessor's service contracts or inspected or performed any work on the allegedly defective machine. *Tucker*, 645 F.2d at 626. The Court noted that while the successor's employees allegedly had serviced similar machines and knew of the defect alleged these allegations alone were insufficient to give rise to a duty to warn. *Id.* The Court concluded that "the bare assertion that [the successor] knew of the defective nature of the ... machine and of its location ... does

not show the necessary 'relationship between the successor and the customers of the predecessor.'" *Id.*, at 627 (quoting *Gee*, 615 F.2d at 866).

In this case, the record establishes that Olin Corporation or one of its affiliated companies performed "maintenance, servicing or repair" on Model 1897 shotguns and provided spare parts for the Model 1897 shotgun from December 22, 1931 through July 21, 1981. *See* Defendants' Answers and Objections to Plaintiffs' Interrogatories Directed to All Defendants, Nos. 9, 10, and 11. Olin Corporation also accepted any warranty obligations of WRAC–Del. which constituted "current liabilities" as defined in the *Final Decree. See* Defendants' Answers and Objections to Plaintiffs' Interrogatories Directed to All Defendants, No. 112. David McCollister, a Technical Consultant to the Director of Engineering of Olin Corporation, testified that Olin may have attempted to repair Model 1897 shotguns manufactured by WRAC–Del. McCollister Transcript, at 34–37. McCollister further testified that Olin was aware of the type of defect which plaintiffs alleged caused Tara Tracey's injury in this case.[23] *Id.*, at 54.

Significantly, however, plaintiffs have produced no evidence that defendants succeeded to any service contracts covering Model 1897 shotguns. Nor is there evidence that the Model 1897 shotguns were subject to service contracts. Moreover, plaintiffs have produced no evidence that any of the defendants performed service on the particular shotgun involved in this case or that defendants were aware of the location of the shotgun or the location of its owner.[24]

---

**23.** McCollister testified that he was aware that the Model 1894 shotgun had the type of "exposed hammer" which the present plaintiffs allege was defective. McCollister Transcript at 52. He further testified that he knew of no specific differences between the Model 1894 hammer mechanism and the Model 1897 hammer mechanism. *Id.*, at 54–55.

**24.** Plaintiffs argue that discovery is incomplete regarding their failure to warn claims because by Order dated January 30, 1990 I precluded plaintiffs from taking the deposition of the Olin

witness most knowledgeable about the Model 1897 design, operation and history. Plaintiffs' Reply Brief in Support of Motion for Summary Judgment, at 30. Plaintiffs imply that if this witness's deposition were taken, the answers might create issues of material fact concerning the failure to warn issue. I decline to accept this argument.

The successor failure to warn factors focus on the relationship of the successor to the particular product in question. In this case, plaintiffs are in the best position to be aware of any relationship between the Model 1897 shotgun in

Given these facts, I will follow *Tucker* and *Gee* and conclude that because plaintiffs have produced no evidence of a specific relationship between defendants and the particular Model 1897 shotgun in issue defendants are entitled to summary judgment on this issue. Absent such a relationship, the facts that the defendants may have known of the type of defect involved in this case and may have serviced certain Model 1897 firearms do not justify the imposition of a duty to warn in this case.

## V. Conclusion.

For the foregoing reasons, I will grant defendants' motion for summary judgment and deny plaintiffs' motion for summary judgment.[25]

## ORDER

AND NOW, this 28th day of August, 1990, for the reasons set forth in the accompanying memoranda, it is hereby ORDERED that:

1. Defendants' motion to strike certain portions of plaintiff's reply brief is DENIED.

2. Plaintiffs' motion for summary judgment is DENIED.

3. Defendants' motion for summary judgment is GRANTED. Judgment is hereby entered in favor of defendants and against plaintiffs.

4. Defendants' motion for modification of my Order dated November 14, 1989 is DENIED as moot.

question and defendants. Plaintiffs have submitted no affidavits or other evidence asserting that any of the defendants ever performed service on the particular shotgun involved in this case or that defendants were aware of the location of the shotgun or the location of its owner. Furthermore, plaintiffs' description of the witness which they seek to depose does not include any reference to the particular shotgun at issue in this case.

Plaintiffs filed this action on January 13, 1987. They have served and received answers to at least 123 Interrogatories and have taken the depositions of McCollister and Johnnie Jackson, one of Olin Corporation's Deputy General Counsels. Plaintiffs have therefore had ample time and opportunity to discover any evidence that defendants had any contact with the shotgun at issue.

25. The parties' briefs on the cross-motions for summary judgment assume that the disposition of the motions will control the case as to all defendants. Therefore, I will enter summary judgment in favor of all defendants.