MEMORANDUM
 

 PADOVA, District Judge.
 

 In this product liability suit, Plaintiff Harold Lacy seeks to hold Defendant Carrier Corp. (hereinafter “Carrier”) liable under a theory of “successor liability” for injuries he sustained when he came into contact with an exhaust fan manufactured by a firm that was later acquired by Carrier. Plaintiff asserts causes of action in negligence, strict liability, and breach of warranty. Presently before
 
 *377
 
 the Court is Carrier’s motion for summary judgment. Also before the Court is Plaintiffs cross motion for partial summary judgment; Plaintiff moves the Court to find that Carrier is potentially liable for Plaintiffs injuries as a matter of law as a successor corporation to the fan’s manufacturer.
 

 For the reasons that follow, I shall deny Carrier’s motion for summary judgment and I will grant Plaintiffs motion for partial summary judgment.
 

 I. FACTUAL ALLEGATIONS AND BACKGROUND
 

 Plaintiff alleges that on February 9, 1993, while he was cleaning the walls of a Philadelphia fire station in the course of his employment as a firefighter, Plaintiffs left arm inadvertently made contact with an unguarded exhaust fan, thereby causing severe injury to his arm.
 

 The following facts are uncontested. The fan in question was manufactured by an entity known as ILG Industries, Inc. some time between June 1968 and January 1972. ILG Industries, Inc. was a Delaware corporation incorporated in 1915.
 

 Pursuant to an agreement dated December 27, 1972 which became effective in February 1973, Carrier, a Delaware corporation, acquired ILG Industries, Inc.; Carrier merged its wholly-owned subsidiary, JHG Corp., into ILG Industries, and operated the consolidated entity as a Carrier division bearing the name ILG Industries.
 
 See
 
 December 27, 1972 Agreement and Plan of Reorganization, Carrier’s Mem.Supp.Mot.Summ.J.Ex.B (hereinafter “the 1972 Agreement”). The merger was accomplished by a stoek-forstock transaction. Each share of Carrier’s wholly-owned subsidiary, JHG, was converted into a share of the new common stock of ILG.
 
 Id.
 
 at ¶ 3.1(a). In exchange, each outstanding share of the old common stock of ILG Industries was converted into four shares of Carrier common stock.
 
 Id.
 
 at ¶ 3.1(b). The 1972 Agreement contained no provision by which Carrier assumed the liabilities of ILG Industries, Inc.
 

 Carrier continued to manufacture the ILG Industries product line through its ILG Industries division. Carrier operated the ILG Industries division until December 1978, when an Illinois Corporation known as ILG Industries, Inc. purchased all of the assets, properties, and operations of the ILG Industries division from Carrier.
 
 See
 
 December 28, 1978 Agreement, Carrier’s Mem.Supp. Mot.Sum.J.Ex.C (hereinafter “the 1978 Agreement”). Under the terms of the 1978 Agreement, Carrier explicitly retained responsibility for product liability suits only with respect to items manufactured and/or sold by the Carrier ILG Industries division during the 1973-1978 period.
 
 Id.
 
 at § 11. After the 1978 sale, Carrier ceased to produce or service the product line it had acquired from the first ILG Industries. The second ILG Industries, Inc., an entity with no connection to Carrier, operated as a distinct and separate corporate entity until it filed for Chapter 7 bankruptcy protection in 1991.
 
 [1]
 

 II. STANDARD OF REVIEW
 

 Fed.R.Civ.P. 56(c) provides that summary judgment “shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.” Fed.R.Civ.P. 56(c). An issue is “genuine” only if there is sufficient evidence with which a reasonable jury could find for the non-moving party.
 
 See Anderson v. Liberty Lobby, Inc.,
 
 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Furthermore, bearing in mind that
 
 *378
 
 all uncertainties are to be resolved in favor of the nonmoving party, a factual dispute is only “material” if it might affect the outcome of the case.
 
 Id.
 
 A party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact.
 
 See Celotex Corp. v. Catrett,
 
 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). Where the non-moving party bears the burden of proof on a particular issue at trial, the movant’s initial
 
 Celotex
 
 burden can be met simply by “pointing out to the district court that there is an absence of evidence to support the non-moving party’s case.”
 
 Id.
 
 at 325, 106 S.Ct. at 2554. After the moving party has met its initial burden, summary judgment is appropriate if the non-moving party fails to rebut by making a factual showing “sufficient to establish an element essential to that party’s ease, and on which that party will bear the burden of proof at trial.”
 
 Id.
 
 at 322,106 S.Ct. at 2552.
 

 III. DISCUSSION
 

 Carrier argues that Plaintiff has no viable cause of action against Carrier because the fan in question was manufactured by ILG Industries, Inc. prior to Carrier’s acquisition, and Carrier sold the ILG Industries division to another company in 1978, which then operated as an independent corporation for some 15 years before Plaintiff was injured. Plaintiff rebuts that when Carrier acquired the assets of ILG Industries, Inc. in 1973 and continued to produce the same product line, Carrier became strictly liable for injuries caused by defects in units of the same product line produced prior to the acquisition. Plaintiff further contends that Carrier’s liability persists despite its sale of the ILG Industries division in 1978 and the subsequent bankruptcy filing of the second ILG Industries, Inc.
 

 In Pennsylvania, “[o]rdinarily when one company sells or transfers all its assets to another company, the latter is not hable for the debts and liabilities of the transferor simply by virtue of its succession to the transferor’s property.”
 
 Husak v. Berkel, Inc.,
 
 234 Pa.Super. 452, 341 A.2d 174, 176 (1975). Six exceptions exist to the general rule of non-liability for successor corporations.
 
 Hill v. Trailmobile, Inc.,
 
 412 Pa.Super. 320, 603 A.2d 602, 605-606 (1992).
 
 [2]
 
 Plaintiff argues that the evidence supports a finding that Defendant Carrier is potentially hable to Plaintiff under two of the exceptions — the “product line” and
 
 “defacto
 
 merger” exceptions.
 
 [3]
 
 Carrier contends that under the holding in
 
 Morales v. Crompton & Knowles Corp.,
 
 888 F.Supp. 682 (E.D.Pa. 1995), it cannot be held hable under either theory because it is an “intermediate successor,” i.e., it acquired the manufacturer of the exhaust fan after the allegedly defective product was made and sold off the operations before Plaintiff was allegedly injured. Plaintiff rebuts that
 
 Morales
 
 is distinguishable from the instant ease and therefore not controlling. Carrier further argues that even if
 
 Morales
 
 is not controlling, the evidence does not estabhsh the applicability of either the product line or
 
 de facto
 
 merger exceptions and, therefore, it is not hable to Plaintiff.
 

 A. Applicability of
 
 Morales
 
 and
 
 Nieves
 

 Carrier asserts that the facts in
 
 Morales
 
 are similar to those in the instant case and argues that
 
 Morales’
 
 holding provides that neither the product line nor
 
 de facto
 
 merger exceptions are apphcable to hold Carrier hable to Plaintiff. In
 
 Morales,
 
 the court was
 
 *379
 
 confronted with the same issue presented here:
 

 whether any of the successor liability exceptions upon which plaintiff relies are applicable to an
 
 intermediate successor,
 
 i.e., a corporation which acquired another business
 
 subsequent
 
 to the alleged conduct upon which plaintiffs’ claims are based and completely divested itself of said business
 
 prior to
 
 the accident in which plaintiff was allegedly injured.
 

 888 F.Supp. at 686 (emphases added).
 

 Morales
 
 appears to be a one-of-a-kind case in Pennsylvania successor liability jurisprudence.
 
 [4]
 
 In
 
 Morales,
 
 the plaintiff-wife was allegedly injured in 1992 while operating a wrapping machine originally manufactured in 1959.
 
 Id.
 
 at 684. In 1960, the defendant/intermediate successor acquired the original manufacturer which made the allegedly defective machine, dissolved the corporation as an independent entity, began operating it as a wholly-owned subsidiary, and continued to produce the same line of packaging machinery.
 
 Id.
 
 In 1976, the defendant sold the packaging machinexy business to another company, and ceased to engage in that line of business.
 
 Id.
 
 The acquiring company was subsequently sold to a second company, which, in turn, sold the assets to a third company which was manufacturing automatic packaging equipment at the time of suit.
 
 Id.
 

 Similarly, in the instant case, the original ILG Industries, Inc. manufactured the fan which allegedly injured Plaintiff prior to its merger with Carrier. After operating the ILG Industries division for approximately five years, Carrier sold off the division in 1978 to another company known as ILG Industries, Inc. The second ILG Industries then operated as an independent corporation for several years before Plaintiff was allegedly injured.
 

 Plaintiffs in
 
 Morales
 
 argued that the intermediate successor was liable to them under the
 
 de facto
 
 merger, continuation, and product line exceptions to the general rule of non-liability of successor corporations.
 
 Id.
 
 at 685. Similarly, in the instant ease, Plaintiff argues that the 1972 Agreement demonstrates that Carrier is liable under the merger and product line exceptions.
 

 With respect to the merger and continuation exceptions, the
 
 Morales
 
 court predicted that under Pennsylvania law “such bases for successor liability are abrogated when the successor corporation sells the previously acquired business prior to the occurrence of an injury arising out of such business.”
 
 Id.
 
 at 686. The court found that before the accident occurred no “vestige” of the manufacturer remained within the defendant’s corporate structure, and once the defendant sold off the previously-acquired manufacturer, the defendant ceased to be in the business of producing or servicing the machinery that injured Plaintiff.
 
 Id.
 
 Because the defendant was not at the time of the accident nor at the time of suit the viable entity that was the product of a merger with or a continuation of the original manufacturer, the
 
 Morales
 
 court declined to impose liability under either exception.
 
 Id.
 

 Morales
 
 also predicted that Pennsylvania would not apply the product line exception to the intermediate successor in that case.
 
 Id.
 
 at 688.
 
 Morales
 
 reasoned that holding liable an entity that no longer manufactures the product line undermines the rationale of the exception, i.e., that the entity still receiving benefits from the product line is in the best position to perform the risk-spreading function underlying the principle of strict liability.
 
 Id.
 
 at 686.
 
 Morales
 
 held that the product line exception “demands that the primary inquiry be directed toward whether it is fair to impose liability on a particular defendant under the circumstances of a specific case.”
 
 Id.
 
 at 687 (citing
 
 Dawejko v. Jorgensen Steel Co.,
 
 290 Pa.Super. 15, 434 A.2d 106, 111
 
 *380
 
 (1981)).
 
 [5]
 
 The
 
 Morales
 
 court specifically found that the defendant no longer manufactured packaging machinery, did not manufacture packaging machinery either when the wrapping machine in question was made or when the plaintiff was actually injured, and discontinued that line of business when it sold the operations to a successor.
 
 Id.
 
 For these reasons, the court concluded that it would be unfair to apply the product line exception to the defendant/intermediate successor.
 
 Id.
 
 at 688.
 

 Plaintiff argues that there is one critical difference between the facts in
 
 Morales
 
 and the instant case. In
 
 Morales,
 
 at the time of suit there existed a later viable successor to the defendant/intermediate successor.
 
 Id.
 
 at 684. By contrast, in the instant case, the second ILG Industries filed for Chapter 7 bankruptcy protection two years prior to Plaintiffs alleged accident; therefore, there is currently no viable successor entity to the Carrier ILG Industries division. Plaintiff argues that because of this factual distinction,
 
 Morales
 
 is not controlling in the instant case.
 

 Although Carrier represented in its moving papers that the second ILG Industries dissolved in 1991,
 
 see
 
 Carrier’s Mem.Supp. Mot.Summ.J. at pp. 4, 8, at oral argument held on June 17, 1996, the parties disputed whether there in fact exists a viable successor entity. Carrier contended at oral argument that ILG Industries, Inc. of Illinois may very well be a viable entity despite the fact that it is under bankruptcy protection; moreover, even if Plaintiff may not be able to collect on a judgment against that entity, this is a distinct issue from the question of viability. Plaintiff rebutted at argument that Chapter 7 provides for dissolution of the entity and does not contemplate its reemergence. With the Court’s permission, after oral argument Plaintiff supplied the Court with documentation that ILG Industries, Inc. is in a Chapter 7 bankruptcy proceeding pending in the U.S. Bankruptcy Court in the Northern District of Illinois. Plaintiff also provided correspondence from counsel of the bankruptcy trustee, confirming that another entity had a perfected first security interest on ILG Industries’ assets and there were no assets available to unsecured creditors. By order of the Bankruptcy Court in Illinois, Plaintiff was allowed to proceed with its claims against ILG Industries to the extent of ILG Industries’ insurance coverage. Additional correspondence with the trustee’s counsel, however, indicated that ILG Industries closed its operations in 1991 when it filed for bankruptcy and the trustee was unaware of any insurance coverage for the period in question; another letter from an insurance company confirmed that it was not the carrier at the time of Plaintiff’s alleged accident, and that the company was unable to determine if ILG Industries had any liability coverage at the time of accident.
 

 I need not resolve the issue of the second ILG Industries’ “viability” and thus whether
 
 Morales
 
 is factually distinguishable, however, because I am unwilling to follow the prediction in
 
 Morales
 
 that the Pennsylvania Supreme Court would hold that an intermediate successor can not be held liable under the merger, continuation, and product line exceptions. My conclusion is based on the following analysis.
 

 I first begin with an examination of
 
 Dawejko v. Jorgensen Steel Co.,
 
 290 Pa.Super. 15, 434 A.2d 106, 110 (1981), the first Pennsylvania Superior Court ease to adopt the product line exception as Pennsylvania law. The product line exception provides that when
 

 one corporation acquires all or substantially all the manufacturing assets of another corporation, even if exclusively for cash,
 
 *381
 
 and undertakes essentially the same manufacturing operation as the selling corporation, the purchasing corporation is strictly liable for injuries caused by defects in units of the same product line, even if previously manufactured and distributed by the selling corporation or its predecessor.
 

 Id.
 
 at 110-11 (adopting the product line exception as articulated by the New Jersey Supreme Court in
 
 Ramirez v. Amsted Industries, Inc.,
 
 86 N.J. 332, 431 A.2d 811, 825 (1981)) (internal quotations omitted).
 
 [6]
 

 The
 
 Dawejko
 
 court found that the product line exception was a natural development in the law because it implements the social policies underlying strict products liability.
 
 Id.
 
 at 434 A.2d at 109-10. These policies include ensuring that victims injured by defective products are not left without remedies and spreading throughout society the costs of compensating these victims.
 
 Id.
 
 at 109 (citing
 
 Ray v. Alad Corp.,
 
 19 Cal.3d 22, 136 Cal.Rptr. 574, 579-81, 560 P.2d 3, 8-9 (1977) (internal quotations and citations omitted)).
 

 -1 disagree with the assertion in
 
 Morales,
 
 as noted above, that
 
 Dawejko
 
 stands for the proposition that the “primary inquiry” in applying the exception is whether it would be fair to the defendant corporation given the specific facts of the case. Instead, the
 
 Dawejko
 
 court found “it better not to phrase the new exception too tightly----so that in any particular case the court may consider whether it is just to impose liability on the successor corporation.”
 
 Id.
 
 at 111. In other words, the
 
 Dawejko
 
 court held that fairness to the defendant corporation was one factor to be considered and balanced against the policies underlying strict liability.
 

 As discussed
 
 supra, Dawejko
 
 adopted the product line exception enunciated by the New Jersey Supreme Court in
 
 Ramirez v. Amsted Industries, Inc.,
 
 86 N.J. 332, 431 A.2d 811 (1981).
 
 Nieves v. Bruno Sherman Corp.,
 
 86 N.J. 361, 431 A.2d 826, 827 (1981), the companion case to
 
 Ramirez
 
 decided by the New Jersey Supreme Court on the same day, was presented with essentially the same question confronted by the court in
 
 Morales
 
 and in the instant case:
 

 whether the
 
 Ramirez
 
 [product line exception] standard may be extended to impose liability on an intermediate successor corporation [i.e.,] one that acquired all the business assets from the original manufacturer and thereafter transferred those assets to its successor and discontinued the offending product line, all several years before plaintiffs accident occurred.
 

 Id.
 
 at 828. In
 
 Nieves,
 
 the plaintiffs sued the intermediate successor, which no longer manufactured the type of machinery that caused the injury, as well as the current successor corporation, which was currently manufacturing the product line of the original manufacturer that produced the allegedly defective machine; at the time of suit, both were viable entities.
 
 Id.
 
 The
 
 Nieves
 
 court applied
 
 Ramirez
 
 to hold both the intermediate and current successors liable under the product line exception.
 
 Id.
 

 The intermediate successor in
 
 Nieves
 
 purchased the original manufacturer’s entire business, good will, trade name, and substantially all of its assets, and took on those obligations necessary for the uninterrupted continuation of the original manufacturer’s operations.
 
 Id.
 
 After selling its assets to the intermediate successor, the original manufacturer changed its name, distributed the cash proceeds of the sale to its shareholders, and underwent dissolution.
 
 Id.
 
 at 828-29. Eight years later, the intermediate successor sold the assets used in manufacturing the type of machine in question to a viable successor that was currently manufacturing the same product line at the time of injury and suit.
 
 Id.
 
 at 828-29.
 

 
 *382
 
 The
 
 Nieves
 
 court rejected the intermediate successor’s argument that there was no justification for imposing liability on the intermediate successor when it had ceased to manufacture the product line in question and the plaintiff had an available remedy against the current, viable producer of the original manufacturer’s product line.
 
 Id.
 
 at 831.
 

 The fact that there are two such successors to [the original manufacturer] in the present case does not alter the reality that [the intermediate successor’s] acquisition of the business assets and manufacturing operation of [the original manufacturer] contributed to the destruction of the plaintiffs remedies against the original manufacturer. By acquiring the business assets of [the original manufacturer] and continuing the established operation of manufacturing and selling [the original manufacturer’s products], [the intermediate successor] became an integral part of the overall producing and marketing enterprise that should bear the cost of injuries resulting from defective products____ [The intermediate successor’s] prominent role in the overall enterprise of manufacturing [the original manufacturer’s products] is not to be overlooked merely because plaintiffs injury did not occur while [the intermediate successor] was actually engaged in the manufacturing operation.
 

 Id.
 
 (citations and internal quotations omitted). Moreover,
 
 Nieves
 
 held that it was appropriate to apply the product line exception to the intermediate successor because it had the ability to assume the original manufacturer’s risk-spreading and cost-avoidance roles.
 
 Id.
 
 The intermediate successor’s ability to undertake these roles was evidenced by its purchase agreement with the current successor, by which the intermediate successor agreed to retain liability for any personal injury or property damage suits arising out of products it sold before the sale of the business.
 
 Id.
 
 at 831-32.
 

 I predict that Pennsylvania would continue to follow New Jersey law, as it did in adopting the product line exception, and hold liable an intermediate successor that otherwise met the requirements of the product line exception, especially in a situation where, as here, relieving the intermediate successor of liability would likely eliminate Plaintiffs remedy. Allowing a plaintiff to recover against an intermediate successor, particularly when the plaintiff may not have another potential remedy, is in consonance with the policies underlying strict products liability — relieving injured parties of the burden of defective products and instead placing that burden on manufacturers who can better predict and spread the risk.
 

 In a letter submitted to the Court, with the Court’s permission, after the oral argument held on June 17,1996, Carrier presented two arguments as to why this Court should not apply
 
 Nieves.
 
 First, Carrier argued that although
 
 Ramirez
 
 and
 
 Nieves
 
 were companion cases,
 
 Dawejko
 
 chose only to adopt
 
 Ramirez
 
 and did not adopt
 
 Nieves.
 
 Similarly, the United States Court of Appeals for the Third Circuit in
 
 LaFountain v. Webb Indus. Corp.,
 
 951 F.2d 544 (3d Cir.1991) and
 
 Conway v. White Trucks,
 
 885 F.2d 90 (3d Cir. 1989) found that if the Pennsylvania Supreme Court were to adopt the product line exception, it would follow
 
 Dawejko;
 
 the Third Circuit made no mention of
 
 Nieves.
 
 I find this argument without merit because in none of those cases were the courts confronted with the issue of whether to impose liability on an intermediate successor and, therefore, they did not have to reach the question resolved in
 
 Nieves.
 

 Alternatively, Carrier asserted in its letter to the Court that
 
 Nieves
 
 was factually distinguishable because Carrier did not bargain with ILG Industries, Inc. of Illinois to retain any of risks which the intermediate successor in
 
 Nieves
 
 agreed to retain. The 1978 Agreement demonstrates that Carrier’s assertion is incorrect. Specifically, the Agreement states:
 

 With respect to products sold by the Ilg Division before the closing date, Seller shall bear all responsibility, other than for normal warranty service, which shall be assumed by Buyer. The premiums on product liability insurance policies for the period between October 31, 1978 and the closing date shall be a normal cost of operation of the ILG Division.
 

 
 *383
 
 The obligations of the Buyer shall not include the cost of defending Seller against claims, suits or proceedings brought against Seller for damages caused by or resulting from products or parts manufactured, sold and delivered by the ILG Division and those not manufactured by the ILG Division but otherwise sold and delivered by the ILG Division prior to the closing date.
 

 See
 
 1978 Agreement, § 11, at p. 15. I also note that Carrier’s statement in the letter directly contradicts a representation Carrier made in its motion for summary judgment that under the 1978 Agreement, Carrier retained obligations with respect to items manufactured and/or sold by the ILG division between 1973-1978.
 
 See
 
 Carrier’s Mot. Summ.J. at ¶ 10.
 

 Finally, Carrier argued in its moving papers and at oral argument that it is unfair to impose liability on Carrier because it was not benefitting from the product line, i.e., it was not receiving a stream of income from manufacturing the product line, at the time of Plaintiffs alleged accident. I note, however, that Carrier’s benefits from the merger with the first ILG Industries did not stop when it made the last product from the original product line; Carrier received a lump sum of cash when it sold off the assets, operations, and accumulated good will of the ILG Industries division in 1978.
 

 Thus, the next step in our inquiry is to examine whether the evidence presented to the Court establishes the applicability of the product line exception.
 

 B. Applicability of the Product Line Exception
 

 In contrast to the other exceptions to the general rule of successor non-liability, the product line exception shifts the emphasis away from corporate form and formalities and focuses instead on corporate activity, specifically the nature of the business operations. See
 
 Morales,
 
 888 F.Supp. at 685 (citing
 
 Dawejko,
 
 434 A.2d at 108 and
 
 Conway,
 
 885 F.2d at 93).
 

 The
 
 Dawejko
 
 court described several criteria that are pertinent in deciding to apply the product line exception, including whether the purchaser: (1) acquired all or substantially all of the manufacturer’s assets; (2) undertook the same manufacturing operation as the seller: (3) held itself out as an ongoing concern of the seller; (4) maintained the same product, name, personnel, property, and clients as the seller; and (5) acquired the seller’s name and good will and required the seller to dissolve.
 
 Dawejko,
 
 434 A.2d at 110-11 (citations omitted).
 
 Dawejko
 
 stated that it “will always be useful to consider whether the three-part test stated in
 
 Ray v. Alad Corp. ...
 
 has been met.”
 
 Id.
 
 at 111. Thus, the court may also consider whether the purchaser’s acquisition destroyed the plaintiffs remedy; the purchaser has the ability to assume the manufacturer’s risk-spreading role; and the fairness of imposing responsibility on the purchaser for a defective product that was a burden attached to the seller’s good will that is being enjoyed by the successor in the continued operation of the business.
 
 Id.
 
 at 109 (citing
 
 Ray v. Alad Corp.,
 
 19 Cal.3d 22, 136 Cal.Rptr. 574, 579-80, 560 P.2d 3, 8-9 (1977)).
 

 Carrier asserts that under Pennsylvania law, the product line exception may only apply if,
 
 inter alia,
 
 the defendant’s acquisition of the original manufacturer virtually destroyed the plaintiffs remedy against the manufacturer, citing in support
 
 Conway,
 
 885 F.2d at 97 and
 
 Hill,
 
 603 A.2d at 606. Carrier further argues that Carrier’s acquisition of ILG Industries in 1973 did not destroy Plaintiffs remedies against the original manufacturer. Instead, Carrier contends that the original manufacturer “reemerged” as ILG Industries when Carrier sold off the division in 1978 and, therefore, Plaintiffs remedy against the original manufacturer was destroyed upon ILG Industries’ dissolution in 1991, and not when Carrier acquired ILG Industries in 1973. For this reason, Carrier argues that the product line exception is inapplicable.
 

 As an initial matter, there is a split in authority as to whether Pennsylvania law requires that the defendant’s acquisition of the manufacturer “caused” the destruction of the plaintiffs remedy, as opposed to a later event such as the manufacturer’s bankruptcy,
 
 *384
 
 for use of the product line exception.
 
 [7]
 
 In 1990,
 
 Tracey v. Winchester Repeating Arms Co.,
 
 745 F.Supp. 1099 (E.D.Pa.1990),
 
 ajfd without opinion,
 
 (3d Cir.1991) examined ease law from various jurisdictions which held that causation was a required element of the product line exception.
 
 Id.
 
 at 1106-08.
 
 Tracey
 
 also analyzed the commentary to Restatement (Second) Torts § 402A, and concluded that a causal connection between the defendant’s acts and the plaintiffs injuries was a key element justifying application of strict liability.
 
 Id.
 
 at 1108 (citing
 
 Polius v. Clark Equip. Co.,
 
 802 F.2d 75, 81 (3d Cir. 1986) (applying the law of the Virgin Islands)). Based on this analysis,
 
 Tracey
 
 went on to predict that the Pennsylvania Supreme Court would require the causation element in applying the product line exception.
 
 Id.
 

 By contrast, the 1992 opinion in
 
 Olejar v. Powermatic Div. of DeVlieg-Bullard, Inc.,
 
 808 F.Supp. 439, 444 (E.D.Pa.1992) held that the causation element is not a prerequisite for application of the product line exception in Pennsylvania.
 
 Olejar
 
 traced the product line doctrine’s genesis in Pennsylvania to the 1981 Superior Court case of
 
 Dawejko. Id.
 
 at 443.
 
 Dawejko
 
 examined the requisites for applying the product line exceptions in other jurisdictions, including California’s three-part test, as enunciated in
 
 Ray,
 
 136 Cal.Rptr. at 579-80, 560 P.2d at 8-9, requiring that the acquisition cause the destruction of the plaintiffs remedies.
 
 Id.
 
 (citing
 
 Dawejko,
 
 434 A.2d at 109). However,
 
 Olejar
 
 pointed out that
 
 Dawejko
 
 did not adopt the California test as set forth in
 
 Ray,
 
 but instead chose to adopt the more liberal approach followed by the New Jersey Supreme Court in
 
 Ramirez,
 
 431 A.2d at 825.
 
 Id.
 
 (citing
 
 Dawejko,
 
 434 A.2d at 110-11). Thus, to answer the causation question,
 
 Olejar
 
 looked to subsequent New Jersey law and cited with approval a 1992 New Jersey case that specifically examined and rejected California’s causation requirement.
 
 Id.
 
 at 444 (citing
 
 Pacius v. Thermtroll Corp.,
 
 259 N.J.Super. 51, 611 A.2d 153, 156 (1992)). In
 
 Pacius,
 
 the court noted that while both
 
 Ramirez
 
 and
 
 Nieves
 
 considered the
 
 Ray
 
 factors, the New Jersey Supreme Court “did not incorporate them into its holdings,
 
 nor
 
 indicate that they were necessary elements for the imposition of liability.”
 
 Pacius,
 
 611 A.2d at 156.
 
 Olejar
 
 adopted the
 
 Pacius
 
 court’s reasoning that when the original manufacturer is no longer viable, the actual cause of the predecessor’s demise is irrelevant to the risk-spreading goal.
 
 Olejar,
 
 808 F.Supp. at 444 (citing
 
 Pacius,
 
 611 A.2d at 156).
 
 See also Bussell v. DeWalt Prods. Corp.,
 
 259 N.J.Super. 499, 614 A.2d 622, 632 (1992) (adopting
 
 Pacius’
 
 holding that application of the product line exception does not require that the defendant’s acquisition caused the destruction of the plaintiffs remedies against the original manufacturer),
 
 cert. denied,
 
 133 N.J. 431, 627 A.2d 1137 (1993). Based on this analysis,
 
 Olejar
 
 concluded that the Pennsylvania Supreme Court would reject the causation requirement.
 
 Olejar, 808
 
 F.Supp. at 444.
 

 I find the reasoning in
 
 Olejar
 
 persuasive and join it in predicting that the Pennsylvania Supreme Court would hold that a plaintiff does not have to demonstrate that it was the purchaser corporation’s acquisition that destroyed the plaintiffs remedy against the manufacturer in order to apply the product line exception.
 
 [8]
 
 But even assuming
 
 arguendo
 
 that causation is a required element, Carrier presents absolutely no evidence in support of its assertion that the ILG Industries purchased by Carrier in 1972 is the same manufacturer that Carrier sold when it sold its ILG Industries division in 1978 and
 
 *385
 
 that existed as an independent corporation until 1991.
 
 [9]
 

 Instead, both the 1972 and 1978 Agreements, as well as the stipulations of counsel at oral argument, establish that after 1973 ILG Industries of Delaware ceased to exist as a separate, viable entity. This evidence supports a finding that Carrier’s acquisition contributed to the destruction of Plaintiffs remedies against the original manufacturer as a separate entity. As Carrier explicitly acknowledged in its moving papers and at oral argument, by the 1972 Agreement, Carrier acquired the original ILG Industries, and operated it as a division encompassing all of the ILG business until it sold the division in 1978.
 
 See
 
 Carrier’s Mem.Supp. Mot. at ¶ 6. The acquisition was accomplished by a stoek-for-stock transaction. Paragraph 3.1(a) provided that each share of Carrier’s wholly owned subsidiary JHG would be converted into a share of the new common stock of ILG.
 
 See
 
 1972 Agreement at ¶ 3.1(a). In exchange, each outstanding share of the old common stock of ILG would be converted into four shares of Carrier common stock.
 
 Id.
 
 at ¶ 3.1(b). Additionally, under the terms of the 1978 Agreement, Carrier held itself out as the owner of all the assets, properties, and operations of the ILG Industries division and Carrier was the seller in that transaction; the ILG Industries division itself was not the seller 'in the transaction, but was instead the object of the sale.
 
 See
 
 1978 Agreement at p. 1. And I finally note that Carrier was sued in the instant case as “Carrier Corp. d/b/a [doing business as] ILG Industries.” In the absence of any countervailing evidence to refute this conclusion, I find that there exists no genuine issue of fact that the Delaware corporation known as ILG Industries ceased to exist as entity separate and independent from Carrier and, instead, became a Carrier division.
 

 My inquiry does not end here, however, because Plaintiff moves the Court to find as a matter of law that Carrier is potentially liable under the product line exception. Therefore, we must determine whether the exception’s other criteria are met. I initially note that I am aware of no authority that holds that each of the criteria set forth in
 
 Dawejko
 
 must be met before the product line exception may be applied.
 
 See Conway v. White Trucks,
 
 692 F.Supp. 442, 451 (M.D.Pa. 1988) (noting that the
 
 Dawejko
 
 court neither indicated what degree of weight to accord each factor nor decided whether all the factors had to be established in order to impose liability under the exception),
 
 ajfd,
 
 885 F.2d 90 (3d Cir.1989).
 

 First, Article 6 of the 1972 Agreement shows that through the stock transaction Carrier acquired all of the first ILG Industries’ assets.
 
 See
 
 1972 Agreement at Art. 6. For example, the 1972 Agreement provided for the transfer of: (1) all real property owned or leased by ILG,
 
 id.
 
 at ¶ 6.1; (2) all contracts, loan, security, distributor and license agreements, and equipment leases to which ILG was a party,
 
 id.
 
 at ¶ 6.3; (3) lists of key suppliers to ILG and ILG’s biggest customers,
 
 id.
 
 at ¶ 6.4; and (4) ILG’s intellectual property, including patents and patent applications, trademark registrations and trademark registration applications, and trade names owned by ILG.
 
 Id.
 
 at ¶ 6.5.
 

 Second, it is undisputed that the Carrier ILG Industries division undertook the same manufacturing operation as the seller and continued to produce the same, product line. Third, the terms of the 1972 Agreement showed that Carrier planned to hold itself out as an ongoing concern of ILG Industries. The Agreement provided that Carrier’s subsidiary, JHG, would merge into ILG Industries, JHG would then cease to exist as a separate entity, and ILG would be the surviving corporation.
 
 Id.
 
 at ¶ 1.1. The finding that Carrier held itself out as an ongoing concern of ILG is farther confirmed by the 1978 Agreement, which states that Carrier
 
 *386
 
 was selling an entity known as the ILG Industries division; this demonstrates that the division bore the ILG name during the five-year period of its operation by Carrier.
 
 See
 
 1978 Agreement at p. 1.
 

 Fourth, the above-cited sections of the 1972 Agreement demonstrate that Carrier would continue to use the ILG name and sell to ILG’s customers. The Carrier ILG Industries division carried on the same product line using the properties and assets acquired from the first ILG Industries. And with regard to personnel, the 1972 Agreement provided that the original ILG Industries’ officers and directors would continue as officers and directors in the new Carrier division.
 
 See
 
 1972 Agreement at ¶2.3. Fifth, the entire structure of 1972 transaction demonstrates that Carrier intended to capitalize on the goodwill built up by ILG Industries; Carrier merged its own subsidiary into ILG so that ILG would be the surviving entity.
 
 Id.
 
 at ¶ 1.1. Additionally, Plaintiff correctly notes that according to a document submitted by Carrier, after Carrier purchased ILG in 1973, the nameplates on fans subsequently produced by the Carrier division had the wording “Ilg Industries/Division of Carrier Corp.”
 
 See
 
 Carrier’s Mem.Supp.Mot. Summ.J.Ex.A at p. 2. The evidence establishes that Carrier acquired and capitalized on ILG’s name and goodwill. The fifth factor also asks whether the purchaser required the seller to dissolve, and I note that the 1972 Agreement did not require the dissolution of ILG Industries but, instead, provided that ILG would be the surviving entity in the merger.
 
 See
 
 1972 Agreement at ¶ l.l.
 
 [10]
 
 As noted
 
 swpra,
 
 however, the product line exception is less concerned with corporate formalities and emphasizes instead the nature of the successor’s business operations.
 

 I already have discussed
 
 supra
 
 how the evidence supports a finding that Carrier’s acquisition contributed to the destruction of Plaintiffs remedies against the original manufacturer as a separate entity. The next factor to consider is the purchaser’s ability to assume the risk-spreading role. In
 
 Nieves,
 
 as described
 
 supra,
 
 the court concluded that the intermediate successor had the ability to spread the risk of defective products because in its purchase agreement with the current successor, the intermediate successor agreed to retain liability for any personal injury or property damage suits arising out of products it sold before the sale of the business.
 
 Nieves,
 
 431 A.2d at 831-32. As aforementioned, in this case, the 1978 Agreement provided that Carrier would retain responsibility for product liability suits with respect to products manufactured and/or sold by the Carrier ILG Industries division prior to the 1978 sale.
 
 See
 
 1978 Agreement at ¶ 11, pp. 15-16. Thus, I find that Carrier has the ability to assume the risk-spreading role.
 

 Finally, the court must consider whether it is fair to impose successor liability on Carrier given the particular circumstances of this ease. I am cognizant of the argument that there is an element of unfairness in imposing liability on a company which no longer receives the benefits of the product line and sold those operations before Plaintiff was injured. At the same time, the evidence establishes that Carrier capitalized on ILG’s goodwill and for a period of five years was a part of the “overall enterprise” of manufacturing the same product line, and then received a cash benefit when it sold off the division in 1978. Additionally, Plaintiff in the instant case will likely be left without a remedy for his alleged injuries if Carrier is not recognized as a successor in liability. I find that these considerations outweigh any potential unfairness to Carrier.
 

 I find that the evidence establishes substantially all the criteria of the product line exception. Therefore, I hold as a matter of law that Carrier is potentially liable to Plaintiff as a successor corporation under this exception.
 

 Because I conclude that Carrier is potentially liable under the product line exception, I need not reach the question of whether Carrier is also liable under the
 
 de facto
 
 merger exception.
 

 An appropriate Order follows.
 

 
 *387
 

 ORDER
 

 AND NOW, this 19th day of June, 1996, upon consideration of Defendant Carrier Corp.’s Motion for Summary Judgment (Doc. No. 16), Plaintiffs Response in opposition thereto and Motion for Partial Summary Judgment (Doc. No. 17), and Defendant Carrier Corp.’s Reply (Doc. No. 18), Court, and after oral argument held on June 17, 1996, and upon consideration of letters and documents submitted by the parties after oral argument,
 

 IT IS HEREBY ORDERED THAT:
 

 1. Defendant’s Motion for Summary-Judgment is DENIED.
 

 2. Plaintiffs Motion for Partial Summary Judgment is GRANTED. Defendant Carrier Corp. is potentially liable to Plaintiff under the product line exception to the general rule of non-liability for successor corporations.
 

 [1]
 

 . Plaintiff named ILG Industries, Inc. of Chicago, Illinois in his Complaint as a defendant in this action. In its Answer to Plaintiff's Complaint, Carrier responded that after reasonable investigation it had determined that ILG Industries, Inc. had been dissolved pursuant to bankruptcy proceedings. In his response to Carrier's motion for summary judgment, Plaintiff specifically represented that ILG Industries, Inc. filed for protection under Chapter 7 of the Bankruptcy Code in the Northern District of Illinois. ILG Industries, Inc. of Chicago, Illinois has not entered an appearance in this case.
 

 For a further discussion of the current status of ILG Industries, Inc. of Chicago, Illinois, see
 
 infra.
 
 Part III.A.
 

 [2]
 

 . The six exceptions to the general rule of non-liability of a successor corporation are when:
 

 1. the purchaser expressedly or impliedly agreed to assume the obligations;
 

 2. the transaction amounted to a consolidation or merger;
 

 3. the purchasing corporation was merely a continuation of the selling corporation;
 

 4. the transaction was fraudulently entered into to escape liability;
 

 5. the transfer was without adequate consideration and no provisions were made for creditors of the selling corporation; or
 

 6. the purchasing corporation continued the seller's product line.
 

 Id.
 
 at 605-606 (citations omitted).
 

 [3]
 

 . By implication, Plaintiff concedes that there is insufficient evidence to support a finding of liability under the remaining four exceptions to successor non-liability enunciated in
 
 Hill.
 

 [4]
 

 . The
 
 Morales
 
 court noted that counsel did not cite in their briefs any cases which presented these "unusual circumstances” and the
 
 Morales
 
 court’s own research did not uncover any cases with a similar fact scenario or which discussed the “intermediate successor" issue generally.
 
 Id.
 
 at 686 n. 1. Similarly, in the instant case, counsel did not cite, nor did the Court’s own investigation reveal, any other Pennsylvania case that would provide guidance on the "intermediate successor” question.
 
 See also Stutzman v. Syncro Mach. Co., Inc.,
 
 Civ.A. No. 88-9673, 1991 WL 66796, at *8 (E.D.Pa. April 18, 1991) (noting that "there are no cases applying or predicting Pennsylvania law addressing the intermediate successor issue”).
 

 [5]
 

 . The plaintiffs in
 
 Morales
 
 argued that the fairness inquiry should include consideration of whether they might be left without a remedy if they were not allowed to proceed against the intermediate successor.
 
 Id.
 
 The
 
 Morales
 
 opinion stated that the plaintiffs were essentially asking the court to find that "as long as an intermediate successor remains a viable entity, it stands in the shoes of its predecessor regardless of a subsequent sale of the manufacturing assets to another corporation.”
 
 Id.
 
 The court specifically rejected this argument, stating that fairness did not require the product line exception to be applied so broadly, and that it would be arbitrary to create a rule imposing liability on the earliest viable successor regardless of whether it sold off the manufacturing assets.
 
 Id.
 
 Instead, fairness and the risk-spreading rationale of the product line exception required that the exception actually follow the product line.
 
 Id.
 

 [6]
 

 . Although the Pennsylvania Supreme Court has never specifically recognized the product line exception, federal courts applying Pennsylvania law and Pennsylvania appellate courts have acknowledged and/or applied the exception.
 
 See, e.g., LaFountain v. Webb Industries Corp.,
 
 951 F.2d 544, 545 (3d Cir.1991);
 
 Conway v. White Trucks,
 
 885 F.2d 90, 95 (3d Cir.1989);
 
 Morgan v. Havir Mfg. Co.,
 
 887 F.Supp. 759, 762-63 (E.D.Pa. 1994);
 
 Olejar v. Powermatic Div. of DeVlieg-Bullard, Inc.,
 
 808 F.Supp. 439, 440 (E.D.Pa. 1992);
 
 Catasauqua Area School Dist. v. Raymark Industries, Inc.,
 
 662 F.Supp. 64, 68 (E.D.Pa. 1987);
 
 Hill,
 
 603 A.2d at 606;
 
 Dawejko,
 
 434 A.2d at 110-11.
 

 [7]
 

 .
 
 Conway
 
 held only that the product line exception does not apply when a plaintiff has a remedy against the original manufacturer but fails to pursue it;
 
 Conway's
 
 subsequent discussion about causation was only in support of that holding and "cannot be construed as predicting the Pennsylvania Supreme Court’s position on the causation element.”
 
 Tracey v. Winchester Repeating Arms Co.,
 
 745 F.Supp. 1099, 1107 n. 14 (E.D.Pa.1990) (citing
 
 Conway,
 
 885 F.2d at 95),
 
 aff d without opinion,
 
 (3d Cir.1991).
 

 [8]
 

 . Carrier also cited
 
 Hill,
 
 603 A.2d at 606, for the proposition that the product line exception only applies if it was the successor’s acquisition that eliminated the plaintiff's remedy.
 
 Hill
 
 states that this requirement was set forth in
 
 Dawejko. Id.
 
 (citing
 
 Dawejko,
 
 434 A.2d at 109). After reading
 
 Dawejko,
 
 I am in complete agreement with
 
 Ole-jar's
 
 conclusion that
 
 Dawejko
 
 did not impose this as an absolute requirement, but instead held that it was one factor among many to consider.
 

 [9]
 

 . I note, for example, that the original ILG Industries was a Delaware corporation, while the second ILG Industries was an Illinois corporation. Carrier acknowledged at oral argument that formally the two were not the same entity, but argued that the second ILG Industries, Inc. would have been liable because it continued to produce the original ILG Industries’ product line. In other words, the two were not the same entity because to hold the second ILG Industries liable, Plaintiff would have had to establish that one of the six
 
 successor
 
 liability exceptions applied.
 

 [10]
 

 . There is no evidence in the record as to whether the first ILG Industries, Inc. filed the appropriate paperwork in the state of Delaware to formally dissolve after the 1973 merger.