John **GOWER**, Jr. and Debra Gower

v.

**SAVAGE ARMS, INC. et al.**

No. 99–CIV–1572.

United States District Court,
E.D. Pennsylvania.

July 31, 2001.

Marc I. Rickles, Mel D. Kardos, Kardos, Rickles, Sellers &Heley, Newton, PA, for Plaintiff.

Joel Friedman, Dilworth, Paxson, LLP, Philadelphia, PA, Jonathan M. Field, Edelstein, Mintzer & Sarowitz, Philadelphia, PA, for Savage Arms, Inc., Savage Industries, Inc., and Savage Sports Corp.

John P. Penders, Jenifer M. Lener, Marshall, Dennehey, Warner, Coleman and Goggin, Philadelphia, PA, for Emhart Corp., Black & Decker, Inc.

## MEMORANDUM AND ORDER

McLAUGHLIN, District Judge.

The plaintiffs, John and Debra Gower, seek to hold Savage Arms, Inc. and Savage Sports Corporation liable for compensatory and punitive damages under a theory of "successor liability" for injuries John Gower sustained when his hunting rifle discharged inadvertently, shooting him in the foot.[1] Gower alleges that the rifle was defective as follows. First, it was designed so that it could not be unloaded with the safety engaged (the "unloading defect"). Second, it was designed without a detent system, which would have made the safety mechanism more user-friendly ("the detent defect"). Third, it was manufactured with a metal ridge that impaired the functioning of the safety mechanism (the "manufacturing defect"). Fourth, it was not accompanied by adequate warnings. The plaintiffs assert causes of action in strict liability as well as negligence for the above defects. In addition, the plaintiffs assert causes of action for material misrepresentation, negligent misrepresentation, breach of warranty and loss of consortium.

The Court grants the defendants' motion with respect to punitive damages, the "unloading defect", insufficient warnings, misrepresentation, breach of warranty, and all negligence claims. The Court denies the defendants' motion for summary judgment with respect to successor liability. The Court further denies the defendants' motion for summary judgment with respect to the strict liability claims concerning the "detent defect" and the manufacturing defect, as well as Debra Gower's loss of consortium claim without prejudice to renew these arguments after the Court has reached a decision on the pending motion to exclude the testimony of plaintiffs' expert, James Mason.

## I. Facts in the light most favorable to the Plaintiffs

### A. The Incident

The plaintiffs claim damages for injuries sustained in a hunting accident in 1997. On December 15, 1997, John Gower was hunting with his two brothers, Clark and Craig, and with his brother-in-law, Robert Swan, at Long Pond, Pennsylvania. They spent much of the day hunting for deer in the woods. At approximately 4:30 p.m., after a day of hunting, the plaintiff left the woods and headed toward the truck in which they had driven to Long Pond. As he emerged from the woods, he turned around for one more visual sweep of the woods and field. Gower was preparing to unload his gun when the gun discharged, shooting him in the foot. (Def.Ex.I, 27).[2]

---

1. The Complaint lists Savage Arms, Inc., Savage Sports Corporation, and Savage Industries, Inc. as defendants. Savage Industries, Inc. is no longer in existence. Savage Sports Corporation is a holding entity for Savage Arms. All of the Court's holdings in this Memorandum apply equally to Savage Arms and Savage Sports Corporation.

2. In the initial accident report, the Game Warden, Randy Shoup, stated that Gower had been unloading his gun at the time of the incident. (Def.Ex.J). In his deposition testimony and in answers to interrogatories, Gower has stated that he was preparing to unload the gun, but was not yet in the process of unloading it, when it discharged. (Def.Ex. F, 113; Def.Ex. I). The defendants do not dis-

Gower was wearing thick gloves, and his fingers were inside the trigger guard when the gun discharged. At the time of the discharge the plaintiff had not taken the gun off the "safe" position. The rifle was designed so as not to fire when in the "safe" position. (Def.Ex.F, 108–135).

### B. The Rifle

The rifle at issue in this lawsuit is a Savage Model 99C lever action repeating center fire rifle, serial number E850706. It was manufactured in or around 1987 by Savage Industries, Inc. (Def.Ex.E, 13). The plaintiff, John Gower, purchased the rifle in October, 1989 from the Quarry Sporting Goods Store, which no longer exists as a business entity and is not a party to this lawsuit. (Def.Ex.F, 87). At the time of purchase, a Quarry Sporting Goods employee demonstrated to Gower how the safety mechanism on the rifle functioned. (Def.Ex.F, 93).

According to the uncontradicted testimony of Savage Industries' Inspections Supervisor Mark Kwiecien, who is now a Quality Assurance Coordinator for Savage Arms, all guns shipped out by Savage Industries in 1987 were shipped in boxes containing safety manuals. (Def.Ex.G, 89). It is also uncontradicted that John Gower purchased the gun without its box and did not receive a safety manual with the gun. (Def.Ex.F, 161). As confirmed by expert inspections after the incident and conceded by both parties at oral argument, the rifle was not working properly at the time of the accident. (Tr. 13–14). The safety mechanism could only be placed in the "safe" position with more than the usually required force. (Def.Ex. O, P; Pl.Ex. K).

### C. Corporate History

The rifle at issue in this law-suit was manufactured by Savage Industries, Inc. in 1987. (Def.Ex.E, 13). In February 1988, Savage Industries filed for bankruptcy. Around this time, the owners of Savage Industries set up a company, named Savage Arms. In May, 1989 Savage Industries filed a motion in Bankruptcy Court to sell its remaining assets. In July of 1989, Savage Industries sold four of its eleven product lines, including the Model 99 product line, together with associated tooling, machinery, trademarks, trade-names, patents, trade secrets, and goodwill, to Savage Arms. (Def.Ex.E, 17–18).

On November 1, 1989 Challenger International purchased the four product lines and also took over the physical manufacturing plant in Westfield, MA, previously used by Savage Industries.[3] Ronald Coburn, who had initially been a senior vice-president of operations and then president and CEO of Savage Industries, retained the title of president and CEO with Savage Arms after Savage Arms was purchased by Challenger. (Def.Ex.E, 6, 16–18).

After Savage Industries' bankruptcy in 1988 or 1989, Savage Arms contracted with a foreign corporation, Llama, located in Spain, to manufacture the Model 99. Llama used its own equipment, its own processes and procedures and its own components to manufacture the Model 99s. The Model 99s were then shipped to the Savage Arms plant in Westfield, MA, where a stock was attached to the rifles before being distributed. Llama stopped manufacturing the Model 99s around 1992 or 1993. In 1994, Savage Arms continued to

---

pute this later version of the facts, and the Court accepts this version for purposes of this motion.

**3.** The Model 99 line of rifles was not manufactured for a brief period between 1988 and 1989, during the change-over from Savage Industries to Challenger International.

use the remaining component parts supplied by Llama to produce Model 99s. In or around 1995, Savage Arms then began to manufacture the Model 99s itself. (Def.Ex.D, 4).

The defendants claim that Savage Industries sold and/or liquidated all of the manufacturing equipment used to produce the Model 99 Lever Action Rifle in or around September of 1988 prior to contracting with Llama to produce the Model 99s. In addition, the defendants claim that they purchased entirely new equipment in 1995, prior to resuming the manufacture of Model 99s, and that a new manufacturing process was used. (Def.Ex.D, 4). They do not provide any documentation to support these claims. Instead, they rely on their own answers to the plaintiffs' second set of requests for admissions, which they argue are uncontradicted by the record. The deposition of Carl Hildebrandt, who has worked at Savage Industries and then Savage Arms since the 1960s, does seem to contradict these assertions, however: "The same components, other than the six castings we're talking about, are still used that are made from the same tools as they were made when they were designed in the 1960s." (Pl.Ex. C, 21). Based on this statement, the Court infers for purposes of this summary judgment motion that the manufacturing processes and tools remained substantially the same from the 1960s to the present.

Challenger International retained ownership of Savage Arms, Inc. until November 1, 1995, when Ronald Coburn purchased Savage Arms from Challenger International through a holding company, registered as Savage Sports Corporation. (Def.Ex.E, 18–20).

## II. Standard for Summary Judgment

A motion for summary judgment shall be granted where all of the evidence demonstrates "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.Pro. 56(c). The moving party has the initial burden of demonstrating that no genuine issue of material fact exists. Once the moving party has satisfied this requirement, the non-moving party must present evidence that there is a genuine issue of material fact. The non-moving party may not simply rest on the pleadings, but must go beyond the pleadings in presenting evidence of a dispute of fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In deciding a motion for summary judgment, the Court must view the facts and all reasonable inferences derived therefrom in the light most favorable to the non-moving party. *Josey v. John R. Hollingsworth Corp.,* 996 F.2d 632, 637 (3rd Cir.1993).

## III. Discussion

### A. Successor Liability

■ The issue before the Court with regard to successor liability is whether Savage Arms can be held liable for injuries caused by a defective rifle manufactured by Savage Industries. Based on the record, the Court is unable to find as a matter of law that Savage Arms should not be held liable for such injuries.

■ Under Pennsylvania law, "ordinarily when one company sells or transfers all its assets to another company, the latter is not liable for the debts and liabilities of the transferor simply by virtue of its succession to the transferor's property." *Husak v. Berkel, Inc.,* 234 Pa.Super. 452, 341 A.2d 174, 176 (1975). There are six exceptions to this rule. The plaintiffs argue that one of these exceptions, the product-line exception, applies in this case.

 Under the product-line exception, a purchasing corporation is liable for the debts and liabilities of the selling corporation if the purchasing corporation continues the seller's product line.

> Where one corporation acquires all or substantially all the manufacturing assets of another corporation, even if exclusively for cash, and undertakes essentially the same manufacturing operation as the selling corporation, the purchasing corporation is strictly liable for injuries caused by defects in units of the same product line, even if previously manufactured and distributed by the selling corporation or its predecessor.

*Dawejko v. Jorgensen Steel Co.,* 290 Pa.Super. 15, 434 A.2d 106, 110 (1981), quoting *Ramirez v. Amsted Industries,* 86 N.J. 332, 431 A.2d 811, 825 (1981).

Judges of this Court who have considered the issue have decided that the Pennsylvania Supreme Court would follow *Dawejko* and adopt the product-line exception. *See e.g. Lacy v. Carrier Corporation,* 939 F.Supp. 375 (E.D.Pa.1996); *Olejar v. Powermatic Div. Of DeVlieg–Bullard, Inc.,* 808 F.Supp. 439 (E.D.Pa. 1992); *Tracey v. Winchester Repeating Arms Co.,* 745 F.Supp. 1099 (E.D.Pa. 1990), *aff'd without opinion,* (3d Cir.1991). In two cases, the Third Circuit assumed that the Pennsylvania Supreme Court would adopt the product-line exception, but did not apply the exception to the facts before it. *LaFountain v. Webb Industries Corp.,* 951 F.Supp. 544 (3d Cir.1991); *see also Conway v. White Trucks, Div. of White Motor Corp.,* 885 F.2d 90, 95 (3d Cir.1989). I agree with the other judges of this Court that the Pennsylvania Supreme Court would adopt the product-line exception as outlined in *Dawejko.*

The court in *Dawejko* emphasized that the product-line exception should be interpreted broadly: "We also believe it better not to phrase the new [product-line] exception too tightly. Given its philosophical origin, it should be phrased in general terms, so that in any particular case, the court may consider whether it is just to impose liability on the successor corporation." 434 A.2d at 111.

The court listed a number of factors that may be considered by a court in determining whether the product line exception applies. First, although the court declined to adopt a three factor-test developed by the California Supreme Court, it did note that the three factors in question could provide useful guidance in determining whether to apply the product-line exception:

> (1) the virtual destruction of the plaintiff's remedies against the original manufacturer, caused by the successor's acquisition of the business; (2) the successor's ability to assume the original manufacturer's risk-spreading role; and (3) the fairness of requiring the successor to assume a responsibility for defective products that was a burden necessarily attached to the original manufacturer's good will being enjoyed by the successor in the continued operation of the business.

*Dawejko,* 434 A.2d at 109, citing *Ray v. Alad Corp.,* 19 Cal.3d 22, 136 Cal.Rptr. 574, 560 P.2d 3 (1977).

Second, the court listed a number of additional factors that might be relevant to the application of the product-line exception: (1) whether the successor corporation advertised itself as an ongoing enterprise; (2) whether it maintained the same product, name personnel, property, and clients; (3) whether it acquired the predecessor corporation's name and good will; (4) whether the successor corporation's acquisition caused the destruction of the plaintiffs' remedy against the predecessor. *Id.*

Applying the *Dawejko* factors to this case, the Court finds that the facts do support successor liability under the product-line exception. According to the testimony of Ronald Coburn, Savage Arms acquired the Model 99 product line in 1989 together with the associated tools, equipment, and intellectual property, the physical manufacturing plant, and the good will of its predecessor. Savage Arms produced the same product as Savage Industries and continued to use the Savage name and logo for the product line. (Def.Ex.E, 12–18, 33). Although some manufacturing changes were made in the Model 99 over the years after Savage Arms' acquisition of the product line, these changes were not reflected in product information or catalogues. (Def.Ex.E, 67–8). Most of the *Dawejko* factors have thus been satisfied.

The defendants argue, however, that the product line exception should not apply to Savage Arms, because Savage Industries' dissolution was not caused by Savage Arms' acquisition of the product line. There is a split in authority among judges of this Court as to whether the successor's acquisition of the predecessor must have caused the destruction of the plaintiffs' remedy against the original manufacturer for the product-line exception to apply under Pennsylvania law. *See Tracey,* 745 F.Supp. at 1105–6 (predicting that Pennsylvania Supreme Court would require causation); *Lacy,* 939 F.Supp. at 383–4 (predicting that causation would not be required); *Olejar,* 808 F.Supp. at 444 (same).

Even if the Court were to conclude that causation is a required element of the product-line exception, the Court would still deny summary judgment, because the facts related to causation are unclear. Savage Arms was created as a new corporation by the owners of Savage Industries around the time of the bankruptcy. Savage Industries then sold the four product lines to Savage Arms as part of a bankruptcy sale. It therefore appears that Savage Arms came out of bankruptcy under the same ownership. Under these circumstances, Savage Arms would have been liable as a successor to Savage Industries. *Husak,* 341 A.2d at 176 (successor liability is imposed where "the purchasing corporation is merely a continuation of the selling corporation.") Thereafter, Savage Arms was sold to Challenger International. It appears from the record that Savage Arms ceased to exist as an independent entity as a result of that sale. Subsequently, Challenger International sold Savage Arms to Ronald Coburn. It is unclear whether this purchase caused Challenger International to cease business or not. On the facts as presented in the record at this stage, the Court therefore finds that the causation requirement may have been met.

Based on the record before it at this time and for all of the above reasons, the Court denies the defendant's motion for summary judgment with regard to successor liability.

### B. Punitive Damages

■ The defendants move for summary judgment with regard to the plaintiffs' claim for punitive damages on two grounds: (1) punitive damages should not be applied to Savage as a successor corporation; (2) the plaintiffs have failed to set forth evidence showing that the defendant acted willfully or maliciously. The Court grants the defendants' motion, because Savage Arms and Savage Industries do not possess a degree of identity that would justify imposing punitive damages on the successor. *Martin v. Johns–Manville Corporation,* 322 Pa.Super. 348, 469 A.2d 655, 667 (1983), *vacated and remanded on other grounds,* 508 Pa. 154, 494 A.2d 1088 (1985).

In *Martin v. Johns–Manville Corporation*, the Superior Court stated:

> We therefore hold that punitive damages are recoverable against a successor corporation when the plaintiff has shown such a degree of identity of the successor with its predecessor as to justify the conclusion that those responsible for the reckless conduct of the predecessor will be punished, and the successor will be deterred from similar conduct.

*Id.* at 667. The Court further stated that punitive damage awards may only be granted against successor corporations when the "legal change in corporate identity is not accompanied by major changes in the identity of the predecessor's shareholders, officers, directors, and management personnel." *Id.*

A four-judge panel of this Court has predicted that the Pennsylvania Supreme Court would adopt the "degree of identity" test developed in *Martin*. *Myers v. Keene Corporation*, 1985 U.S.Dist. LEXIS 16633 (E.D.Pa. August 21, 1985) (decided by a four judge panel); *see also Duca v. Raymark Industries*, 1986 WL 12770 at *3–4 (E.D.Pa., Nov.7, 1986) (discussing *Martin* and *Myers* ). The Court will follow *Myers* and adopt the *Martin* "degree of identity" test in this case.

The plaintiffs have failed to show a sufficient degree of identity in order to permit the imposition of punitive damages in this case. They rest their argument on the employment histories of two individuals: Ronald Coburn and Mark Kwiecien. Ronald Coburn was the president and CEO of Savage Industries prior to 1989. He was then President and CEO of Savage Arms between 1989 and 1995. In 1995, he purchased Savage Arms through a holding company, Savage Sports Corporation. Coburn is currently on the Board of Directors of Savage Sports Corporation. (Ex. D.5–6, 20). He is the only Savage Sports Corporation executive who previously also worked for Savage Industries. Savage Sports Corporation's current board of directors consists of three individuals in addition to Ronald Coburn. Two of these officers joined the board when Coburn purchased Savage Arms through Savage Sports Corporation in 1995, and the fourth joined the board more recently. (Ex. E.37–38). Coburn currently owns fifteen percent of the stock in Savage Sports Corporation. The other eighty-five percent is owned by Fleet Investment Corporation. Neither Coburn nor Fleet owned shares in Savage Industries or in Savage Arms prior to 1995. (Ex. E, 42–43).

Mark Kwiecien has been employed in the quality control area of Savage Industries and Savage Arms since at least 1987. (Def.Ex.G, 11). He was an inspections supervisor for Savage Industries and, at the initiation of this lawsuit, was a quality assurance coordinator for Savage Arms. (Pl.Ex. L, 7; Def.Ex. G, 11).

The record also indicates that at least one other employee, Carl Hildebrandt, currently a senior design engineer, remained with the company throughout the corporate changes. (Def.Ex.E, 60). The plaintiffs have not relied on Hildebrandt's continued employment in their argument on punitive damages, however.

The Court finds that the plaintiffs have not produced sufficient evidence to survive summary judgment on the punitive damages claim. The continued involvement of one corporate officer/director and one supervisory-level employee does not create the degree of identity that would permit imposition of punitive damages under *Martin*. Therefore, the Court need not reach the question of the nature of the defendants' conduct. The defendants' motion for summary judgment on the punitive damages claim is granted.

## C. Strict Liability

■ The Pennsylvania Supreme Court has adopted Section 402(a) of the Restatement (Second) of Torts:

(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if (a) the seller is engaged in the business of selling such a product, and (b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

(2) The rule stated in Subsection (*l*) applies although (a) the seller has exercised all possible care in the preparation and sale of his product and (b) the user or consumer has not bought the product from or entered into any contractual relation with the seller.

Section 402(a), *Restatement (Second) of Torts*. *See also Azzarello v. Black Brothers Company*, 480 Pa. 547, 391 A.2d 1020 (1978). In order to succeed in a claim brought under 402(a), the plaintiffs must show (1) that the product was defective, (2) that the defect existed at the time the product left the manufacturer's hands, and (3) that the defect caused the plaintiff's injury. *Phillips v. A–Best Products Company*, 542 Pa. 124, 665 A.2d 1167, 1170 (1998).

### 1. The Alleged Defects

The plaintiffs allege the following four defects: (1) the gun was not accompanied by warnings; (2) the gun was defectively designed in that it cannot be unloaded while in the "safe" position (the "unloading defect"); (3) the gun was defectively designed in that it did not incorporate a detent system, which would have made the safety mechanism more "user-friendly" (the "detent defect"); and (4) the gun was defectively manufactured with a metal ridge that caused the gun's safety mechanism to fail over time (the "manufacturing defect").

### a. Insufficient Warnings

■ The Pennsylvania courts have recognized a cause of action under 402A for insufficient warnings. *See Berkebile v. Brantly Helicopter Corp.*, 462 Pa. 83, 337 A.2d 893, 902 (1975). For an insufficient warnings claim, the plaintiffs must establish the same three elements required under 402A for design defect claims, including causation.

The Court grants the defendant's motion for summary judgment with respect to the plaintiffs' insufficient warnings claim, because the plaintiffs have failed to present any evidence that the lack of instructions caused Gower's injury. In *Sherk v. Daisy–Heddon*, 498 Pa. 594, 450 A.2d 615 (1982), the Court held that the manufacturer of a BB gun was not liable for injuries sustained when the plaintiff fired the gun at a friend:

Where, as here, the lethal propensity of a gun was known or should have been known to the user, liability cannot be imposed upon the manufacturer merely because the manufacturer allegedly has failed to warn of that propensity.

*Id.* at 618. The Court reasoned that insufficient warnings could not be the cause of the injury, because the plaintiff had independent knowledge of the gun's dangerous propensities.

John Gower had extensive training in the use and safety of firearms while in the United States military. (Def.Ex.F, 7–8, 13–14). In his deposition, John Gower testified that he was familiar with the Ten Commandments of Firearm Safety, one of which states: "Never point your gun at anything you don't want to shoot." (Def.Ex.F, 163–4). Gower also testified

that he made a practice of complying with the No. 1 Commandment, which reads: "Don't rely on your gun's safety. Treat every gun as if it were loaded and ready to fire." (Def.Ex.F, 172). The Court finds that Gower was aware of the dangers inherent in the use of a gun and that the holding of *Sherk* is applicable.

■ In addition, the plaintiffs have not provided any evidence that the gun was lacking instructions when it left the manufacturer's hands. Mark Kwiecien has testified that every rifle left the manufacturing plant with a manual. (Def.Ex.G, 89). Gower has testified that he did not receive a manual when he purchased the gun from Quarry Sporting Goods off the rack (i.e. not in its original box). (Def.Ex.F, 161). Gower has not produced any evidence, however, to contradict Kwiecien's statement that all guns were shipped with manuals. According to comment "n" to Section 388 of the Restatement (Second) of Torts, a supplier's duty to warn is discharged by providing information to third parties upon whom it can reasonably rely to communicate the information to the ultimate users of the product. *See Phillips v. A.P. Green Refractories Company*, 428 Pa.Super. 167, 630 A.2d 874, 882 (1993) (holding that Section 388 is available as·a defense in strict liability actions). *See also Smith v. Walter C. Best, Inc.*, 927 F.2d 736, 739–42 (3d Cir.1990).

For these reasons, the Court grants the defendants' motion for summary judgment with respect to the failure to warn claim under 402A.

### b. The "Unloading Defect"

The plaintiffs allege that the Model 99 rifle is defectively designed in that the shooter must take the firearm off safety in order to unload the chamber. (Pl.Ex.H). John Gower claims not to have been unloading the gun when it discharged, however. Therefore, the fact that the gun could not be unloaded while in the "safe" position is not causally related to Gower's injury. At oral argument, plaintiffs' counsel conceded that this design defect argument fails due to lack of causation. (Transcript, 31– 32). Because this design defect claim fails the causation prong of 402(a), the Court need not decide whether it satisfies the other elements of a design defect claim under 402(a).

### c. The "Detent Defect"

■ The plaintiffs' expert, James Mason, alleges that "lack of positive detents on the safety slide will leave an operator with the impression that the safety is 'on' when indeed the gun is ready to fire." According to James Mason's expert report, a safety mechanism with a detent system would make it easier for a user to tell whether the safety had been engaged, because the position of the safety would be more clearly visible and because the mechanism would make an audible clicking noise when placed into the "safe" position. A detent system would also prevent the safety from slipping into the "fire" position.

■ In order to determine whether a gun without a detent system is unreasonably dangerous, the Court must undertake a risk/utility analysis. *See Surace v. Caterpillar*, 111 F.3d 1039 (3d Cir.1997). The risk/utility analysis in the current case would rely entirely on the expert testimony provided by James Mason, because neither party has presented any additional evidence that would enable the court to undertake such a balancing. The Court notes that, in his report, James Mason described the "exemplar trigger system" as "adequate" and found only that the detent would make the rifle more "user friendly". On this basis, it seems unlikely that Mason's report would support a finding that the gun without the detent is

"unreasonably dangerous". Nonetheless, the Court declines to rest its decision on this basis for two reasons.

First, the defendant, who bears the burden of proof for this threshold determination as to whether the product is unreasonably dangerous, has provided no evidence that would enable the Court to make this determination. *Monahan v. Toro Company*, 856 F.Supp. 955 (E.D.Pa.1994).

Second, the Court is unwilling to rely solely on Mason's report in making this determination without first deciding the defendants' pending *Daubert* motion regarding Mason.[4] Mason's report does not clearly distinguish between the "detent defect" and the "manufacturing defect" or between the factual bases for his views on either one. Due to this lack of clarity in the writing of the report, the Court is unwilling to make a decision at this stage without holding a hearing in which Mason can more clearly explain the bases for and the meaning of his report.

■■■ In addition, the Court is unwilling to make an implicit decision concerning the admissibility of Mason's testimony by relying on the report without first making an explicit admissibility decision. To be considered at the summary judgment stage, the non-moving party's evidence need not be in a form that would be admissible at trial, but it must be evidence that "could be later presented in a form that would be admissible at trial—i.e. reducible to admissible form." *North American Specialty Insurance Company v. Chichester School District*, 2000 WL 1052055 at \*8 (E.D.Pa. July 20, 2000). The Third Circuit has held, for example, that hearsay evidence produced in an affidavit opposing summary judgment can be considered, because it could later be presented at trial through

direct testimony. *Williams v. Borough of West Chester*, 891 F.2d 458, 466 (3d Cir. 1990).

Given the pending *Daubert* motion, the Court cannot at this time determine whether any of the statements in Mason's expert report could later be presented in a form that would be admissible at trial. For this reason, the Court cannot determine whether Mason's expert report should be considered as evidence at the summary judgment stage.

The Court, therefore, denies the defendant's summary judgment motion with respect to the "detent defect" claim without prejudice to the defendant to renew the motion after the Court's decision on the *Daubert* motion.

### d. The "Manufacturing Defect"

■■■ The plaintiffs allege that there was a manufacturing defect in the rifle in the form of a metal ridge that affected the functioning of the safety mechanism:

> The subject safety button has a shallow ridge on the bottom of its rear radius that contacts the rising radius of the slot. This contact limits (to about .133–inch) the free, unobstructed movement of the button to the rear when applying the safety. This defective condition was present at the time of manufacture.

(Pl.Ex.H.) For purposes of summary judgment, the question of whether the ridge rendered the gun defective is not difficult to answer. In *Dambacher v. Mallis*, 336 Pa.Super. 22, 485 A.2d 408 (1984), the court stated: "In a manufacturing defect case, the question whether the product is defective is relatively simple. Since the allegation is that something went awry in the manufacturing process, so that, for example, the product lacked a component it should have had, the finder of fact need

---

4. The defendants requested that the motion for summary judgment be decided prior to

the motion to exclude testimony, and the plaintiffs did not object.

only compare the product that caused the injury with other products that were manufactured according to specifications." *Id.* at 426. Mason undertook such a comparison and found that the subject rifle had the above-mentioned metal ridge, whereas an exemplar rifle of the same model did not.

The defendants, however, challenge Mason's claim that the defect was present at the time of manufacture as being entirely without a factual foundation. As with all other evidence submitted on a motion for summary judgment, expert affidavits must be reviewed in light of Fed. R.Civ.P. 56. As the First Circuit stated in *Hayes v. Douglas Dynamics, Inc.,* 8 F.3d 88 (1st Cir.1993):

> We are not willing to allow reliance on a bare ultimate expert conclusion to become a free pass to trial every time that a conflict of fact is based on expert testimony ... Where an expert presents "nothing but conclusions—no facts, no hint of an inferential process, no discussion of hypotheses considered and rejected", such testimony will be insufficient to defeat a motion for summary judgment.

*Id.* at 92, citing *Mid-State Fertilizer v. Exchange National Bank,* 877 F.2d 1333, 1339 (7th Cir.1989). *See also Duffy v. United States,* 1996 WL 472409 at *2 (E.D.Pa. Aug.19, 1996).

The Court is not able to determine whether the statement lacks a factual foundation without allowing Mason to respond at a hearing, however. In *Padillas v. Stork–Gamco,* 186 F.3d 412 (3d Cir. 1999), the Third Circuit held that the trial court abused its discretion by failing to hold an *in limine* hearing before excluding an expert report under the *Daubert* standard at the summary judgment stage:

> The district court's analysis of the Lambert Report does not establish that Lambert may not have had 'good grounds' for his opinions, but rather that they are insufficiently explained and the reasons and foundations for them inadequately and perhaps confusingly explicated. But if the court was concerned with the factual dimensions of the expert evidence, it should have held an in limine hearing to assess the admissibility of the report, giving plaintiff an opportunity to respond to the court's concerns ... [W]hen the ruling on admissibility turns on factual issues, as it does here, at least in the summary judgment context, failure to hold such a hearing may be an abuse of discretion.

186 F.3d at 418. *See also Oddi v. Ford Motor Company,* 234 F.3d 136, 151 (3d Cir.2000). For the above reason, the Court denies the defendant's summary judgment motion with respect to the "manufacturing defect" claim without prejudice to the defendant to renew the motion after the Court's decision on the *Daubert* motion.

### 2. Material Misrepresentation

The plaintiffs allege that the defendants made material misrepresentations under Section 402B of the Restatement (Second) of Torts:

> One engaged in the business of selling chattels who, by advertising, labels, or otherwise, makes to the public a misrepresentation of a material fact concerning the character or quality of a chattel sold by him is subject to liability for physical harm to a consumer of the chattel caused by justifiable reliance upon the misrepresentation.

Restatement (Second) of Torts, 402B. More specifically, the plaintiffs claim that the defendants knew or should have known of the allegedly defective conditions and failed to warn John Gower, thereby misrepresenting that the firearm was safe for

its intended use. Section 402B has been adopted under Pennsylvania law. *See Klages v. General Ordnance Equipment Corporation,* 240 Pa.Super. 356, 367 A.2d 304, 310 (1976).

Even assuming for purposes of this discussion that John Gower will be able to establish either a design defect or a manufacturing defect, he has failed to establish material misrepresentation. John Gower has not pointed to any assurances made by the defendants regarding the safety of his rifle. In the plaintiffs' response to defendants' motion for summary judgment, plaintiffs' counsel stated that Gower relied on the good reputation of Savage rifles in purchasing the Model 99C. There is no evidence in the record, however, that he even considered the brand of the rifle or its reputation when purchasing the rifle. (Def.Ex.F, 99–100). Even had Gower relied on the manufacturer's reputation, this would not give rise to a cause of action under 402B. In *Berkebile,* the Pennsylvania Supreme Court held that a helicopter manufacturer's claim in an advertising brochure that "you are assured a safe, dependable aircraft" was "mere puffing", not a material misrepresentation. 337 A.2d at 903. The good reputation of a manufacturer does not rise to the level of a material misrepresentation under Pennsylvania law.

■■■ Deliberate non-disclosure of a material fact can also constitute material misrepresentation, however. *Kent v. Costruzione Aeronautiche Giovanni Agusta,* 1990 WL 139414 (E.D.Pa. September 20, 1990); *Delahanty v. First Pennsylvania Bank,* 318 Pa.Super. 90, 464 A.2d 1243, 1252 (1983). In *Kent,* the plaintiff alleged that a manufacturer of helicopters failed to disclose that there were known manufacturing and design flaws in its helicopters, despite specific inquiries from the plaintiff's decedent about vibrations in his heli-

copter's rotor system. The Court held that this allegation, if supported by facts, would support a claim for misrepresentation. Gower has not pointed to any facts, however, that would suggest that either Savage Industries or Savage Arms were ever aware of the alleged manufacturing defect in his rifle. In addition, he has not produced any evidence to show that the defendants deliberately failed to disclose the lack of a detent system in the rifle. Savage Arms' actions cannot, therefore, be characterized as deliberate non-disclosure. For the foregoing reasons, the Court grants the defendants' motion for summary judgment with respect to the claim under 402(B).

## D. Negligence and Breach of Warranty

■■■ The plaintiffs' claims of negligence and breach of warranty must be dismissed, because the product line exception only applies in strict liability actions. The plaintiffs' sole remedy in this case is against Savage Arms or Savage Sports Corporation as successor corporations, because Savage Industries is no longer in existence. (Tr. 4–5). The plaintiffs argue that Savage Arms is liable for defects in the rifle, manufactured by Savage Industries, under the product-line exception to the general rule of successor non-liability. The Third Circuit has suggested, however, that this exception, first developed in *Dawejko,* applies only to strict liability actions. *Philadelphia Electric Company v. Hercules,* 762 F.2d 303, 311 (3d Cir.1985) ("In *Dawejko,* the Pennsylvania Superior Court adopted a new exception to the general rule of nonliability—the so-called 'product line exception—that applies *only* in products liability cases'" [emphasis in original] ). Another judge of this Court recently agreed with this analysis, stating:

Plaintiff's negligence and breach of warranty claims must fail as a matter of law. Plaintiff's only viable claim against Defendant as a successor in interest sounds in strict liability. Plaintiff admits in her complaint that Defendant did not manufacture the granulator, but argues that Defendant is liable as a successor to the machine's manufacturer. Because the "product line" exception does not extend to breach of warranty and negligent claims, both claims shall fail.

Rivera v. Mossberg, 2000 WL 464058 at *3 n. 1 (E.D.Pa. April 20, 2000). The court in Dawejko emphasized the fact that the product line exception was developed to address the policies underlying strict liability:

> It is perhaps only a matter of style how one proceeds. One may retain the traditional exceptions, but expand their boundaries ... Or one may adopt a new exception, such as the product-line exception. We believe it better to adopt a new exception. To the extent the law has changed ..., the change may be explained as an attempt to implement "the social policies underlying strict products liability."

Dawejko, 434 A.2d at 111, quoting Ramirez, 431 A.2d at 825. Because the plaintiffs' only viable claim is under the product-line exception, their negligence and breach of warranty claims against Savage Arms, the successor corporation, must be dismissed as a matter of law.

### E. Loss of Consortium

■ Debra Gower claims damages for loss of consortium, based on the injuries suffered by John Gower. The Court cannot at this time determine whether the defendants will bear any liability for John Gower's injuries. The Court, therefore, denies the motion for summary judgment with respect to Debra Gower's loss of con-

sortium claim without prejudice to renew after the Court's decision on the motion to exclude the testimony of James Mason.

### IV. Conclusion

For the above reasons, the Court denies the defendants' motion for summary judgment with respect to successor liability. In addition, the Court denies the defendants' motion for summary judgment with respect to the strict liability claims concerning the "detent defect" and the manufacturing defect, as well as Debra Gower's loss of consortium claim without prejudice to renew after the Court's decision on the motion to exclude the testimony of James Mason. The Court grants the defendants' motion with respect to punitive damages, the "unloading defect", insufficient warnings, misrepresentation, breach of warranty, and all negligence claims.

An appropriate order follows.

### ORDER

**AND NOW,** this 31st day of July, 2001, upon consideration of the defendants' motion for summary judgment and plaintiffs' response thereto, it is hereby **ORDERED** and **DECREED** that the motion is **GRANTED** in part and **DENIED** in part.

For the reasons stated in a Memorandum of today's date, the Court grants the defendants' motion with respect to punitive damages, the "unloading defect", insufficient warnings, misrepresentation, breach of warranty, and all negligence claims. The Court denies the defendants' motion for summary judgment with respect to successor liability. The Court further denies the defendants' motion for summary judgment with respect to the strict liability claims concerning the "detent defect" and the manufacturing defect, as well as Debra Gower's loss of consortium claim without prejudice to renew these arguments after

the Court has reached a decision on the pending motion to exclude the testimony of plaintiffs' expert, James Mason.